IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM J. LANG LAND CLEARING, INC. | ) | |
| | ) | ARB CASE NOS. 01-072; 01-079 |
| Petitioner, | ) | |
| | ) | ALJ CASE NOS. 98-DBA-1 through 6 |
| vs. | ) | |
| | ) | CIVIL ACTION NO. 04-10336 |
| ADMINISTRATOR, WAGE & HOUR DIVISION, | ) | |
| U.S. DEPARTMENT OF LABOR, and | ) | Honorable David M. Lawson |
| ADMINISTRATIVE REVIEW BOARD, | ) | |
| U.S. DEPARTMENT OF LABOR, | ) | Magistrate Judge Charles E. Binder |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

**PETITIONER, WILLIAM J. LANG LAND CLEARING, INC.'S,
CROSS-MOTION FOR SUMMARY JUDGMENT**

Petitioner William J. Lang Land Clearing, Inc. ("Lang"), through its attorneys, hereby moves this Honorable Court for summary judgment pursuant to Fed. R. Civ. P. 56, and in support of its motion, states as follows:

1.     That the United States Department of Labor, Wage and Hour Division, investigated Lang's pay practices with respect to six prime contracts subject to the Davis-Bacon Act, 40 U.S.C. 3141, *et seq.* ("DBA"), and the Contract Work Hours and Safety Standards Act, 40 U.S.C. 3701, *et seq.* ("CWHSSA"), and concluded that Land committed three types of DBA fringe benefit violations; specifically (1) that Land took improper credit for meals and lodging it provided its employees; (2) that Lang improperly used an annual across-the-board average of its health insurance premium payments to compute hourly fringe benefit credit for same; and (3) that Land improperly took DBA prevailing wage credit for certain vacation payments.  In addition to the alleged fringe benefit violations, the Wage and Hour Division concluded that Lang misclassified its power equipment operators to a lower paid group classification.

2.     That the matter proceeded to a contested case hearing before the Honorable Daniel J. Roketenetz, Chief Administrative Law Judge, who ruled in favor of Lang with respect to its credit for meals and lodging, its averaging of health insurance, and also with respect to Lang's classification of its equipment operators.  Judge Roketenetz ruled in favor of the Administrator with respect to Lang's vacation payments and, thus, disallowed credit for same.

3.     That the matter was appealed by both parties to the Administrative Review Board, U.S. Department of Labor, on each issue resulting in a Final Decision and Order dated September 28, 2004, in which the Board affirmed the Judge's denial of credit to Lang for its

vacation payments, and reversed the Judge's decision which had credited Lang for meals and

lodging, and its averaged health insurance, and had approved Lang's classification of its

operators.

      4.     That the findings and conclusions contained within the Final Decision and Order

of the Administrative Review Board are arbitrary, capricious, an abuse of discretion, or are

otherwise not in accordance with law, specifically:

        A.     Lang properly classified its employees under the "Group 4" category of the wage determinations applicable to the projects at issue in this case and the Board's conclusion to the contrary constitutes legal error;

        B.     Lang properly took prevailing wage credit with respect to its longstanding practice of providing reimbursement of meals and lodging expenses its employees incurred on the projects at issue in this case and the Board's conclusion to the contrary constitutes legal error;

        C.     Lang properly calculated the hourly amount of prevailing wage credit it took with respect to health insurance costs it provided to employees working under the projects at issue in this case and the Board's conclusion to the contrary constitutes legal error;

        D.     Lang properly took prevailing wage credit for the payment it made as vacation pay to employees working under the projects at issue in this case, even if Lang may have included those payments along with bonus pay and the Board's conclusion to the contrary constitutes legal error; and

        E.     Lang properly met all prevailing wage and fringe benefit obligations to those employees working on the projects at issue in this case, including those employees who worked as laborers, and the Board's failure to find accordingly constitutes legal error.

      WHEREFORE, Petitioner, William J. Lang Land Clearing, Inc., prays that this

Honorable Court grant summary judgment to Lang with respect to each issue and claim raised in

this matter and enter an order reversing the errors contained in the Final Decision and Order of

the Administrative Review Board dated September 28, 2004.

Dated:  July 18, 2005                    /s/ KRAIG M. SCHUTTER

                                         4449 Fashion Square Boulevard
                                         Saginaw, Michigan  48603
                                         (989) 792-4499
                                         kschutter@mpslaborlawyers.com
                                         P45339

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM J. LANG LAND CLEARING, INC. | ) | |
| | ) | ARB CASE NOS. 01-072; 01-079 |
| Petitioner, | ) | |
| | ) | ALJ CASE NOS. 98-DBA-1 through 6 |
| vs. | ) | |
| | ) | CIVIL ACTION NO. 04-10336 |
| ADMINISTRATOR, WAGE & HOUR DIVISION, | ) | |
| U.S. DEPARTMENT OF LABOR, and | ) | Honorable David M. Lawson |
| ADMINISTRATIVE REVIEW BOARD, | ) | |
| U.S. DEPARTMENT OF LABOR, | ) | Magistrate Judge Charles E. Binder |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

**PETITIONER, WILLIAM J. LANG LAND CLEARING, INC.'S,
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

STATEMENT OF QUESTIONS PRESENTED...........................................................................ii

JURISDICTION AND STANDARD OF REVIEW .....................................................................iii

INDEX OF AUTHORITIES.......................................................................................................iv

STATEMENT OF FACTS ........................................................................................................ 1

ARGUMENTS

       A.     LANG PROPERLY CLASSIFIED ITS EMPLOYEES UNDER
THE "GROUP 4" CATEGORY OF THE WAGE DETERMINATIONS APPLICABLE TO THE
PROJECTS AT ISSUE IN THIS CASE AND
THE BOARD'S CONCLUSION TO THE CONTRARY CONSTITUTES
LEGAL ERROR…………………………………………………………………...3

       B.     LANG PROPERLY TOOK PREVAILING WAGE CREDIT WITH
RESPECT TO ITS LONGSTANDING PRACTICE OF PROVIDING
REIMBURSEMENT OF MEALS AND LODGING EXPENSES ITS
EMPLOYEES INCURRED ON THE PROJECTS AT ISSUE IN THIS
CASE AND THE BOARD'S CONCLUSION TO THE CONTRARY CONSTITUTES
LEGAL ERROR………………………………………………….…15

       C.     LANG PROPERLY CALCULATED THE HOURLY AMOUNT OF
PREVAILING WAGE CREDIT IT TOOK WITH RESPECT TO
HEALTH INSURANCE COSTS IT PROVIDED TO EMPLOYEES
WORKING UNDER THE PROJECTS AT ISSUE IN THIS CASE
AND THE BOARD'S CONCLUSION TO THE CONTRARY
CONSTITUTES LEGAL ERROR………………………………………….…….35

       D.     LANG PROPERLY TOOK PREVAILING WAGE CREDIT FOR
THE PAYMENT IT MADE AS VACATION PAY TO EMPLOYEES
WORKING UNDER THE PROJECTS AT ISSUE IN THIS CASE,
EVEN IF LANG MAY HAVE INCLUDED THOSE PAYMENTS
ALONG WITH BONUS PAY AND THE BOARD'S CONCLUSION
TO THE CONTRARY CONSTITUTES LEGAL ERROR……………………..42

       E.     LANG PROPERLY MET ALL PREVAILING WAGE AND FRINGE
BENEFIT OBLIGATIONS TO THOSE EMPLOYEES WORKING ON
THE PROJECTS AT ISSUE IN THIS CASE, INCLUDING THOSE EMPLOYEES
WHO WORKED AS LABORERS…………………………….46

CONCLUSION…………………………………………………………………………..47

## STATEMENT OF QUESTIONS PRESENTED

A.    DID LANG PROPERLY CLASSIFY ITS EMPLOYEES UNDER THE GROUP 4"
      CATEGORY OF THE WAGE DETERMINATIONS APPLICABLE TO THE PROJECTS AT
      ISSUE IN THIS CASE AND DOES THE BOARD'S CONCLUSION TO THE CONTRARY
      CONSTITUTE LEGAL ERROR?

        Petitioner says, "Yes."
        Respondent says, "No."

B.    DID LANG PROPERLY TAKE PREVAILING WAGE CREDIT WITH RESPECT TO ITS
      LONGSTANDING PRACTICE OF PROVIDING REIMBURSEMENT OF MEALS AND
      LODGING EXPENSES ITS EMPLOYEES INCURRED ON THE PROJECTS AT ISSUE IN
      THIS CASE AND DOES THE BOARD'S CONCLUSION TO THE CONTRARY
      CONSTITUTE LEGAL ERROR?

        Petitioner says, "Yes."
        Respondent says, "No."

C.    DID LANG PROPERLY CALCULATE THE HOURLY AMOUNT OF PREVAILING WAGE
      CREDIT IT TOOK WITH RESPECT TO HEALTH INSURANCE COSTS IT PROVIDED TO
      EMPLOYEES WORKING UNDER THE PROJECTS AT ISSUE IN THIS CASE AND DOES
      THE BOARD'S CONCLUSION TO THE CONTRARY CONSTITUTE LEGAL ERROR?

        Petitioner says, "Yes."
        Respondent says, "No."

D.    DID LANG PROPERLY TAKE PREVAILING WAGE CREDIT FOR THE PAYMENT IT
      MADE AS VACATION PAY TO EMPLOYEES WORKING UNDER THE PROJECTS AT
      ISSUE IN THIS CASE, EVEN IF LANG MAY HAVE INCLUDED THOSE PAYMENTS
      ALONG WITH BONUS PAY AND DOES THE BOARD'S CONCLUSION TO THE
      CONTRARY CONSTITUTE LEGAL ERROR?

        Petitioner says, "Yes."
        Respondent says, "No."

E.    DID LANG PROPERLY MEET ALL PREVAILING WAGE AND FRINGE BENEFIT
      OBLIGATIONS TO THOSE EMPLOYEES WORKING ON THE PROJECTS AT ISSUE IN
      THIS CASE, INCLUDING THOSE EMPLOYEES WHO WORKED AS LABORERS AND
      DID THE BOARD FAIL TO ADDRESS THIS ISSUE?

        Petitioner says, "Yes."
        Respondent's answer is unknown.

## <u>JURISDICTION AND STANDARD OF REVIEW</u>

The case is before the Court on judicial review of agency action pursuant to 5 U.S.C. 702 and 704.  The scope of review is therefore governed by 5 U.S.C. 706(2)(A), which reads in pertinent part as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

While the Sixth Circuit Court of Appeals has held that such review is "deferential" to the agency, the Court nevertheless requires an agency decision to be supported by substantial evidence and it will not hesitate to overturn an agency decision where it is plainly erroneous or inconsistent with regulatory text.  <u>Carabell, et. al.</u> v. <u>U.S. Corps of Engineers and EPA</u>, 391 F.3d 704, 707 (6th Cir. 2004) citing <u>Bowles</u> v. <u>Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414; 89 L.Ed 1700; 65 S.Ct 1215 (1945) and <u>United States</u> v. <u>Cinemark USA, Inc.</u>, 348 F.3d 569, 578 (6th Cir. 2003).

## <u>INDEX OF AUTHORITIES</u>

**<u>Supreme Court Cases</u>**

<u>Bowles</u> v. <u>Seminole Rock & Sand Co.</u>,
325 U.S. 410, 414; 89 L.Ed 1700; 65 S.Ct 1215 (1945)..........................................................iii

<u>Brooklyn Savings Bank</u> v. <u>O'Neil</u>,
324 U.S. 697, 706-07, 89 L. Ed. 1296, 65 S. Ct. 895 (1945)................................................30

<u>Camp</u> v. <u>Pitts</u>,
411 U.S. 138, 143, 36 L.Ed.2d 106, 93 S.Ct. 1241 (1973)…………………………………32

<u>Consumer Product Safety Comm'n</u> v. <u>GTE Sylvania, Inc.</u>,
447 U.S. 102, 108, 64 L.Ed.2d 766, 100 S.Ct. 2051 (1980)................................................32

**<u>Federal Court of Appeal Cases</u>**

<u>Carabell, et. al.</u> v. <u>U.S. Corps of Engineers and EPA</u>,
391 F.3d 704, 707 (6th Cir. 2004) ......................................................................................iii

<u>Davis Bros., Inc.</u> v. <u>Donovan</u>,
700 F.2d 1368, 1370 (11th Cir. 1983)…………………………………………………...30

<u>Herman</u> v. <u>Collis Foods, Inc.</u>,
176 F.3d 912; 5 W & H Cases 2d 343 (6th Cir. 1999)……………………………………33

<u>Laffey</u> v. <u>Northwest Airlines, Inc.</u>,
642 F.2d 586, 587 (DC Cir. 1980)…………………………………………………..32-33

<u>Miree Construction Corp.</u> v. <u>Dole</u>,
930 F.2d 1536; 30 W & H Cases 502 (11th Cir. 1991)…………………………………38-39

<u>Scanlan</u> v. <u>Texas A&M University</u>,
343 F. 3d 533 (5th Cir. 2003)……………………………………………………………12

<u>Soler</u>, *et al.* v. <u>G & U, Inc.</u>,
833 F.2d 1104; 28 WH Cases 593 (2nd Cir. 1987)................................................................30

<u>Tom Mistick & Sons, Inc.</u> v. <u>Reich</u>,
54 F.3d 900; 2 W & H Cases 2d 1285 (D.C. Cir. 1995)........................................................39

<u>United States</u> v. <u>Cinemark USA, Inc.</u>,

348 F.3d 569, 578 (6th Cir. 2003) ........................................................................iii

<u>United States</u> v. <u>Southern California Edison Co.,</u>
300 F. Supp. 2d 964 (E.D. Cal., 2004) ....................................................13

<u>Virginia Agricultural Growers Ass'n v. Donovan,</u>
774 F.2d 89, 93 (4th Cir. 1985) ..........................................................32

**<u>Federal District Court Cases</u>**

<u>G & C Enterprises, Inc.</u> v. <u>Wage Appeals Board,</u>
619 F.Supp 1430, 1432 (D.C. N.J. 1985) ..............................................19

<u>Thompson v. Diocese of Saginaw,</u>
204 WL 45519 (ED Mich 2004) ............................................................45

<u>United States</u> v. <u>Southern California Edison Co.,</u>
300 F. Supp. 2d 964 (E.D. Cal., 2004) ..................................................13

**<u>Administrative Agency Cases</u>**

<u>Calculus, Inc.,</u>
WAB Case No. 93-06 (1993) ...........................................................22-24,
26, 28, 33-34

<u>Cedar Lane Apartments,</u>
WAB #72-5 (1972) ................................................................................ 11

<u>Cody-Zeigler, Inc.,</u>
WAB Case No. 89-19 (Apr. 30, 1991) ...................................................24

<u>Collinson Construction Co.,</u>
WAB Case No. 76-09 (1977) .............................................................27-28

<u>In Re Corley,</u>
77-DB-114, 23 WH Cases 1071 (1978) ................................................6, 9

<u>Greggo & Ferraro,</u>
WAB Case #82-6 (1983) ...................................................................... 11

<u>Layne-Northern Co.,</u>
WAB Case 85-15 (1985) .......................................................................15

<u>Thompson</u> v. <u>Diocese of Saginaw,</u>

2004 WL 45519 (ED Mich, 2004) ............................................................................................ 45

Trataros Construction Corp.,
WAB Case No. 92-03 (1993) ............................................................................................ 6
TRL Systems,
WAB Case #86-8 (1986) ................................................................................................15

Warren Oliver Co.,
WAB Case #84-8 (1984) ................................................................................................15

**Federal Statutes**

29 C.F.R. 3.5(j) ............................................................................................................22-23,26

29 C.F.R. 5.29(f) ................................................................................................................24

29 C.F.R. 5.5(a)(5) ............................................................................................................21

29 C.F.R. 5.59(a)(1)(ii)(A) ................................................................................................14

29 C.F.R. 531.3(a) and (b) ................................................................................................21

29 C.F.R. 531.29 ................................................................................................................22

29 C.F.R. 531.31 ................................................................................................................21

29 C.F.R. 531.32(a).......................................................................................................29, 31

29 C.F.R. 778.217 ..............................................................................................................29

5 U.S.C. 702.......................................................................................................................iii

5 U.S.C. 704.......................................................................................................................iii

5 U.S.C. 706.......................................................................................................................iii

Copeland "Anti-Kickback" Act, 40 U.S.C. 276c ..............................................................21

Davis-Bacon Act, 40 U.S.C. 276a…………………………………………………4,11, 15-10, 21-24,
26, 37-41, 43-45, 47

Fair Labor Standards Act, 29 U.S.C. 206(a)......................................................................20

29 U.S.C. 216(m) ...........................................................................................................20

**Other:**

Black's Law Dictionary .................................................................................................19

Department of Labor Field Operations Handbook……………………………...22-25, 29, 37

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Lang Land Clearing ("Lang") is a construction contractor located in Beaverton, Michigan.  It does business throughout the state of Michigan.  Mr. William Lang founded the company in 1972 and it has at all times specialized in land clearing operations.  In the fall of 1996, the United States Department of Labor, Wage and Hour Division, ("the Administrator") investigated the company's obligation to pay prevailing wage and fringe benefit rates on several prevailing wage projects within the State of Michigan.  The Administrator concluded that Lang had committed errors with respect to the six federal projects identified in the caption to this case. Specifically, the Administrator has taken the position that Lang mis-classified its operators into a lower wage category than was appropriate; that the company had improperly taken fringe benefit credit for its reimbursement of the meals and lodging costs its employees would have otherwise incurred out of pocket; and that the company had neglected to pay fringe benefits to a handful of laborers for a short time on one project (DBA 3).  When the matter could not be resolved administratively, the parties prepared for trial before Administrative Law Judge Daniel J. Roketenetz.  Approximately eight weeks before trial, the Administrator alleged additional violations, in particular, that Lang had miscalculated fringe benefit credit for payment of employee health insurance premiums and that it had improperly referred to vacation payments as "bonus" payments, thereby rendering void the fringe benefit credit taken.

The Respondent contends that it has, at all times, properly paid all of its employees working on the federal projects at issue in this case.  Significantly, Judge Roketenetz agreed with nearly all of Lang's arguments after hearing and considering the matter.  The Judge agreed that Lang properly classified its operators as operating mulching equipment and stump removers

because the equipment was used by the operators on those projects for that specific purpose – to mulch trees and shrubs and to remove stumps.  He also agreed that Lang should get prevailing wage credit, either as bona fide fringe benefit credit or as cash wages, for reimbursing employees their meals and lodging because the employees received real monetary value and Lang incurred real monetary expense when Lang provide this fringe benefit.  The Judge also concluded that Lang provided fringe benefits (including meals and lodging fringe benefit) to all employees regardless of whether they were working as operators or laborers, so that Lang did not fail to pay fringe benefits to any laborers on any projects at issue in this case.  Finally, with respect to the Administrator's eleventh hour claim that Lang had miscalculated health insurance fringe benefit credit, the Judge approved Lang's method of averaging the costs of employee health insurance on an annualized basis (as opposed to the Administrator's preferred monthly, individualized basis) because it more accurately reflects the true costs of providing health insurance to Lang's employees.  Judge Roketenetz's only error related to his finding that Lang could not take vacation pay credit on the DBA-3 project because the payments did not meet technical requirements of certain regulations.  Yet, there is no dispute that those payments were made to employees specifically to meet prevailing wage obligations.  Lang believes that the company should not be penalized with an $11,000.00 forfeiture simply because it may have placed the wrong label on the payments or paid them in a lump sum.

Both Lang and the Administrator filed cross appeals to the Administrative Review Board ("Board").  The Board reversed the Judge's findings of fact and conclusions of law with respect to each issue in this case, except that the Board affirmed the Judge's conclusion disallowing Lang credit for payment of vacation pay.  Essentially, the Board agreed entirely with the

2

Administrator's legal positions in this case.  Lang contends the Board's rulings contain errors of

law and it now seeks judicial review of the Board's determinations.  Accordingly, the parties

have filed cross motions for summary judgment pursuant to this Court's Order dated June 28,

2005.

## ARGUMENTS

**A.    LANG PROPERLY CLASSIFIED ITS EMPLOYEES UNDER THE
       "GROUP 4" CATEGORY OF THE WAGE DETERMINATIONS
       APPLICABLE TO THE PROJECTS AT ISSUE IN THIS CASE AND THE
       BOARD'S CONCLUSION TO THE CONTRARY CONSTITUTES LEGAL
       ERROR.**

Throughout the 1970s and early 1980s, Lang cleared land using only bulldozers.  This

work was extremely dangerous and operators manning the bulldozers had to be highly skilled

and experienced to perform the work (Lang, p. 577).  These operators would bulldoze paths

through farmland and even dense forests, knocking down trees and pushing them into piles.

Later, the mounds of trees were disposed of by burning (Lang, p. 575).  Whenever the company

performed land clearing work under a federal contract for airport or highway work, it classified

its bulldozer operators under Group 1 of the applicable wage determination.  Mr. Lang testified

that he selected Group 1 because bulldozers were specifically identified within that group (Lang,

pp. 578-579).  Moreover, the bulldozers were used, in effect, as earth-moving equipment.

By the late 1980s, demand for clearing farmland waned and Lang began to consider

clearing land around roads and highways near cities.  However, since burning was not permitted

in these areas, Lang was forced to reexamine and retool its operations.  Lang purchased a

Morbark Waste Recycler (or "tub grinder") (Resp Exb 10, p. 1584) and forestry equipment

observed to have been used for harvesting trees in northern Michigan, including hydro-axes and

skidders (Adm Exb 11a, p. 874) (Lang, p. 575).  The hydro-axes with mower attachments are the first pieces of equipment used on a land clearing project.  This allows for mulching shrubs and trees up to 7" in diameter.  Then, the mower attachment is removed and a buncher head attached which allows the operator to mechanically cut trees up to about 20" in diameter.  The felled trees are then arranged in bundles or "skids" which are dragged by a skidder with a grapple attachment to a chipper.  The chipper, in turn, mulches the trees into fine chips which are hauled away by truck.  The remaining stumps were uprooted by bulldozer and then ground with the tub grinder.  In 1991, Mr. Lang invented the wheel grinder (Adm Exb Y, pp. 1534-1537) to replace the tub grinder and eliminated the need for bulldozers on site altogether.  The wheel grinder allows an operator to grind any stump in place without any need to uproot it (Lang, p. 585).  About one-third of Lang's operation is spent using the hydro-axes, another third is spent utilizing the grapple skidders and chipper, and the remaining third is spent grinding stumps with the wheel grinder (Lang, p. 588).

Since the time Lang switched to forestry equipment[1], it has classified all of its operators as Group 4 operators on highway and transportation projects to which the Davis-Bacon law has applied.  The reasons are simple, logical and legally correct.  First, the classifications of wage determination are arranged generally by function.  The heavy earth-moving and highway

---

[1]Lang sold off all of its earth-moving equipment years ago.  The company brochure doesn't even advertise its two remaining bulldozers.  Mr. Lang testified that the only reason the company has kept the two bulldozers around is because one can be used as a backup grapple skidder and the other has a winch on it which can be used on those rare occasions when a machine gets stuck or the chipper needs to be moved into tight quarters (Lang, Tr 585).  On cross examination, all of Lang's employees who testified agreed that the bulldozers are used only on sporadic and rare occasion, and not as earth-moving equipment (Rosa, Tr 82-83; Warner, Tr 122; Cameron, Tr 141; Dyke, Tr 193-195).

construction and paving equipment is listed in Group 1 (Lang, p. 589, 615).[2]  Aggregate

equipment is listed in Group 2 (Lang, p. 615).  Power tool operators are generally listed in Group

3 and miscellaneous equipment such as farm, trucking and forestry equipment are listed in Group

4.  Significantly, Lang's equipment is clearly forestry equipment – not heavy earth-moving

equipment.[3]  Thus, it was classified within Group 4.

Second, and perhaps even more important, the power equipment classifications found in

the wage determination specifically list within Group 4 "all mulching equipment" and "stump

remover."  Clearly, Lang's forestry equipment is used precisely for removing and transforming

trees and stumps into mulch.  Lang's various machinery is used synergistically in one integrated

mulching operation.  The purpose of Lang's forestry equipment on its land clearing jobs is to cut

trees and transform them into mulch.

Significantly, trade magazines specifically refer to Lang's equipment as mulching

equipment.  The hydro-ax brochure (Stip Exb EE) advertises that the rotary ax attachment "cuts

and mulches single trees up to seven inches in diameter."  The hydro-ax also has a stump grinder

---

[2]Even the Administrator's witness, John Hamilton, President of Local 324, testified that Group 1 describes road building equipment (Hamilton, Tr 231).

[3]Not only did Mr. Lang testify that his equipment is forestry equipment, but he also demonstrated through explanation of exhibits that the construction industry as a whole considers such equipment as forestry equipment.  Lang produced several construction trade publications which identified hydro-axes (with mower attachments and buncher head attachments), skidders, both track and wheel (including grapple attachments), and tree chippers as forestry equipment (Lang, Tr 594-597; Resp Exb 11, pp. 1585-1587).  Moreover, even if an employee used a bulldozer *as a bulldozer* on rare occasion, the Administrator's own witness testified that an operator does not have to be reclassified to a different group where he spends about 95 percent of his time operating equipment in a particular group and only 5 percent of his or her time operating a different machine classified in another group as is the case with Lang's use of the machines (Hart, Tr 322-323, 349).  See, also, the testimony of Mr. Fox (Tr 421-422).

attachment that many manufacturers refer to as "mulchers" (Stip Exb EE; Lang, p. 598).[4]   The

wheel grinder appears to have been duplicated by a Canadian firm that manufactures the

"Stumpmaster 1236."  Their brochure and website (Resp Exbs 12, pp. 1588-1589 & 13, pp.

1590) advertise that:

> The PRO MAC S Stumpmaster has been developed for the 'in place'
> removal of tree stumps by grinding.
>
> Depending on the tooth arrangement, a tree stump can be reduced to a
> mulch in place of a stump.
>
> The Rayco "T185 Hydra-Stumper" (Resp Exb 8, pp 1580-1583) is another machine

similar to the wheel grinder which "shreds stumps and roots to mulch on lot and land clearing

sites."  That company also advertises that its mower attachment "chops [trees and underbrush]

into mulch leaving a manicured site ready to develop."  Clearly, the standard understanding in

the construction industry is that the equipment used by Lang for its land clearing operation is

mulching equipment.  Since "all mulching equipment" and "stump remover" are specifically

listed in Group 4 of the wage determination, Lang properly classified its operators within Group

4.[5]

It is important to note that the Administrator at all times bears the burden of proving her

contention that Lang improperly categorized its equipment operators.  Trataros Construction

Corp., WAB Case No. 92-03 (1993); In Re Corley, 77-DB-114, 23 WH Cases 1071 (1978).  In

---

[4]Even the Administrator's witness, Mr. Fox, testified that he could consider the hydro-ax with the mower attachment to constitute mulching equipment (Fox, Tr 386, 391).

[5]In addition to constituting mulching equipment, the wheel grinder's purpose is also to remove stumps and, hence, could also fall under Group 4 as a stump remover.  The Administrator's own witness testified as such (Fox, Tr 392).

order to meet this burden and in an effort to wiggle free from the plain meaning of the wage determination, the Administrator presented witness after witness at the hearing, each called upon to give their best guess as to the factors used in determining proper classification.  Some said it was size, weight, and power of the equipment that was determinative (Swartz, p. 217; Hamilton, p. 227; Hart, p. 289-293; Fox, p. 386-387, 392).  Others thought the skill level of the operator manning the equipment was key (Hamilton, p. 227-228; Hart, p. 289, Fox, p. 387; Park, p. 438; Sickmiller, p. 462).  The union president even theorized that whether the equipment had a seat was an important factor (Hamilton, pp. 259-261).  Yet, it was clear that all these witnesses could do was guess as to how the equipment should be classified.

On cross-examination, the Administrator's witnesses were forced to confront the absurdity of their respective contentions.  For example, it was demonstrated through some of the Administrator's witnesses that some equipment in Group 1 was vastly smaller and weighed considerably less than equipment in the lower classification, including Group 4 (Hamilton, pp. 236-237, 240, 247-249, 257-58; Hart, p. 289 ; Fox, pp. 398-399, 411-412; Resp Exbs 3 (pp. 1562-1563), 4 (pp. 1564-1565), 5 (pp. 1566-1567), 7 (pp. 1572-1579)).  Likewise, it was demonstrated that some equipment found within any particular classification would vary tremendously in size and power and, yet, would remain in the same classification despite these variances.  For example, it was shown that track-type tractors (bulldozers) vary in weight by as much as 224,050 pounds and vary in power by as much as 780 horsepower, yet an operator performing bulldozer work would always be classified within Group 1 (Hamilton, pp. 252-253; Hart, p. 321; Fox, pp. 394-395).  It was also demonstrated at trial that some of the equipment found within Group 1, such as a water pump, takes virtually no skill whatsoever to operate

7

(Hamilton, pp. 237-239; Resp Exb 3, pp. 1562-1563).  Ultimately, all of the Administrator's witnesses were forced to concede that their contentions on direct exam were erroneous concerning size, weight, power, and skill level as factors for classification (Hamilton, pp. 254, 261; Hart, pp. 325-328; Fox 399).[6]  Because the theories of the Administrator's witnesses were so contradictory and disjointed, Judge Roketenetz properly concluded the Administrator had failed to carry the burden of proving its theories in this case (ALJ, p 1737).

Lang has always believed that it is the "use" or "purpose" of its mulching equipment that determines its classification in Group 4.  It has formed this belief for good reason.  As demonstrated above, attempting to classify equipment under the wage determination by size, weight, and/or power of the equipment and/or by skill level of the operator necessarily leads to inconsistent results and confusion.  However, and unlike the Administrator's purported classification method, classifying equipment by use or purpose results in uniform, consistent classification.  For example, as was demonstrated very clearly during trial, the Rayco stump grinders (Resp Exb 8, pp. 1580-1583) range tremendously in size, weight, and power.  Furthermore, the smaller versions of the stump grinder are easy to operate, while the largest and most powerful versions require greater skill.  Yet, when pressed to determine which of the stump grinders fall into Group 1 and which fall into other classifications, the Administrator's witnesses were forced to punt.

Of course, classifying equipment based on purpose of the equipment avoids the inherent difficulties in determining whether any given piece of equipment is too big or small, too

---

[6]Further compelling evidence that size, weight, power, and skill levels of operators are not determinative of the proper classification of equipment can be found within Mr. Lang's direct testimony (Lang, Tr 613-623) and the exhibits referenced therein.

powerful or not powerful enough (and so on) to fit within any particular grouping of the wage determination.  The stump grinders – big or small, powerful or not – serve the purpose of grinding and removing stumps.  Since there is no dispute that some of the Rayco equipment would fall into Group 4 of the wage determination, as the union president and union business manager admitted (Hamilton, pp. 258-260; Hart, pp. 321-326), it is logical that all of these stump grinders would likewise be categorized as Group 4.  Since these Rayco stump grinders would all fall within Group 4, Lang's wheel grinder and all of its other mulching equipment is properly classified within Group 4 of the wage determination.[7]

Perhaps the most important consideration for classifying the operators of Lang's mulching equipment based on the use of the equipment is legal precedent.  The Board has previously indicated that the determining factor for classification decisions is not the skill level of employees (or other such varying factors) but, rather, the "actual work performed."  For instance, in In Re Corley, *supra*, the Judge rejected an argument that certain employees should not be classified in the higher paid classification because the skill levels of his employees were beneath those of the employees of other contractors performing the work identified in the higher classification.  The judge held that:

> [t]he degree of skill actually possessed by the worker is not a controlling factor at this time. *The test of the correctness of the classification is not the skill or experience of the employee, but the actual work performed.*  In this regard, I find that the government has carried its burden by showing that the work performed by the workers listed below in the performance of the contract in question was,

---

[7]Most revealing of the truism that use or purpose of the equipment determines its classification occurred during cross examination of the union president concerning the fact that roller equipment is identified in two separate classifications with the classification distinction based explicitly on the *use* of the roller (Resp Exb 6) (Hamilton, Tr 239-241).

according to the established past practices in the area of Fort Leonard Wood, the work of a pipe fitter.

(Emphasis added).  Therefore, in the present case, the Judge properly concluded that it is the purpose or use of the equipment that determines its classification.

The Administrator found herself in a pickle because she was at odds with the plain wording of the wage determination at issue, at odds with logic and reason, and at odds with legal precedent.  Accordingly, she relied on a fall-back argument that the classification practices of the union are controlling.  In this regard, the Administrator relied on the testimony of the union president and business agent that it was the practice of union contractors to classify under Group 1 any land clearing equipment similar to that used by Lang.  Mr. Fox, a union contractor, testified that his equipment is similar to Lang's and that he classifies his land clearing equipment in Group 1 of the wage determination.  Yet, as the Judge ruled, without some semblance of a consistent workable theory of classification, the contradictory opinions of the Administrator's witnesses could not be deemed as sufficiently establishing an area practice (ALJ, p 1737).[8]

Even if it were assumed that the inconsistent testimony of the Administrator's witnesses was somehow sufficient to prove an area practice, which it was not, the Administrator did not put any competent evidence into the record showing that the Department has, in fact, adopted the collective bargaining agreement of the union as the prevailing wage or that it has adopted the union's "practices" as the prevailing practices for classification under its wage determination.[9]

_____

[8]Union president Hamilton admitted that he didn't even possess such basic knowledge as how many land clearing companies were signatories with his union (Hamilton, Tr 281-282).  Union business manager Hart testified only in the vaguest terms concerning his knowledge of the classification practices of union land clearing contractors working on prevailing wage projects in Michigan (Hart, Tr 334-337).

[9]All that exists is the testimony of Mr. Hamilton and Mr. Park that they have completed WD-10 forms on occasion and sent them to the Department of Labor ("DOL") and Mr. Hart's testimony that he "thinks" the Department uses the union's collective bargaining agreements for wage determinations in

Thus, the Judge correctly ruled that the Administrator failed to carry her burden of proving area practice or that any such area practice has been adopted by the Department with respect to the wage determination at issue in this case (ALJ, p 1737).[10]

On appeal to the Board, the Administrator for the first time referenced information from its website and explained that the wage determinations in this case are identified therein with certain symbols which ultimately reflect collective bargaining agreements of the Operating Engineers, Local 324.  The Administrator then argued that the designation automatically carries with it a determination that the collective bargaining agreement of the Operating Engineers constitutes area practice.  Without any concern for Lang's inability to attack the accuracy of this latent information, the Board readily adopted as "judicial notice" the entirety of the

---

federal highway and airport projects (Hart, Tr 289).  On cross exam, Mr. Hamilton admitted he doesn't have any involvement with the process thereafter and he doesn't know what the Department does with the forms once received (Hamilton, Tr 233). Mr. Park's testimony was equally speculative (Park, Tr 436-438). Mr. Hart testified on re-direct exam that he could not testify competently with respect to the legal implications of the Davis-Bacon Act (Hart, Tr 346).  Thus, just because one or two union contractors have classified their land clearing equipment (not including the wheel grinder) under Group 1 of the wage determination on federal prevailing wage projects does not mean the U.S. DOL has adopted their alleged "practice" as its own determination.

[10] Furthermore, had the Administrator properly examined the actual prevailing practices in the area for determining proper classification of the equipment at issue in this case (which there is no need to do given the plain meaning of the wage determination), she would have found that Lang has contracted more prevailing wage work from 1993 to 1996 than all other land clearing contractors combined, union or non-union (Lang, Tr 573-575).  Thus, the Administrator's preferred method of determining area practice by simply picking up the telephone and placing a call to Mr. Fox (Bliek, Tr. 545; Adm Exb 17, pp. 900-904) – the owner of a union construction firm who performs a minor portion of the prevailing wage work in the state of Michigan (Lang, Tr 569-573) – is defective on its face.  Simply put, deferring to Mr. Fox alone results in the proverbial "tail wagging the dog" in this case.  Proper analysis of area practice would have to involve all of the land clearing contractors, union and non-union, not just Harry Fox, Inc.  Greggo & Ferraro, WAB Case #82-6 (1983) (The long-standing principles of Davis-Bacon's administration established the necessity to determine prevailing area practice with respect to which classification of employees performs a particular type of work in order to determine the applicable prevailing rate required to be paid); Cedar Lane Apartments, WAB #72-5 (1972) (Wage determinations must be predicated upon careful scrutiny of the facts and circumstances in each case and on a locality-by-locality basis).

Administrator's information and argument.  (Board's Order, pp. 2021-2023).  Lang contends that in doing so, the Board committed error.

The set of "facts" of which the Board has taken "judicial notice" constitute perhaps the most important facts to the issue concerning classification.  If a fact or set of facts is likely to be critical to a decision on the law to be applied to a party in interest, there is every reason for that party to have an opportunity to cross-examine and otherwise attack the accuracy of the information provided.  The Board's acceptance as judicial notice of the Administrator's last-minute presentation of critical information in this matter is, therefore, wholly improper.  See Wooden v. Missouri Pacific Railroad Co., 862 F. 2d 560 (5th Cir. 1989).  Not only are the "facts" taken as judicial notice by the Board extremely crucial to the issues in this case, but the information provided is not of some disinterested third-party.  The legal importance of the information offered by the Administrator concerning wage and hour symbols and area practice was *created by the Administrator.*  Thus, it was wholly improper for the Board to take as judicial notice information maintained and created by a litigant in a contested case and accept it as fact and to give it legal effect.  The Administrator could have easily identified and explained through testimony what certain notations meant on a wage determination and explained the relationship those symbols may have to area practice.  Instead, the Administrator kept Judge Roketentenz and Lang in the dark until the matter was before the Board.  Scanlan v. Texas A&M University, 343 F. 3d 533 (5th Cir. 2003) (The district court erroneously deferred to a defendant-created commission rather than presenting the question of material fact to a trier of fact.)   Finally, the Board's decision to accept as judicial notice the Administrator's own critically important, self-managed information concerning wage determination notations and area practice constitutes

12

legal error because a decision maker such as a court or government agency do not take judicial notice of the meaning of unique language of documents, especially where the purpose of accepting the information is to determine what the contents mean.  <u>United States</u> v. <u>Southern California Edison Co.</u>, 300 F. Supp. 2d 964 (E.D. Cal., 2004) (While a court may take judicial notice of general meanings of words, phrases, and legal expressions, documents are judicially noticeable only for purposes of determining what statements are contained therein, not to prove the truth of contents or any party's assertion of what the contents mean.)  Clearly, the Board committed legal error when it accepted as judicially noticed "fact" the Administrator's contention that certain symbols on a wage report demonstrate conclusively that the Wage and Hour Division has adopted a particular collective bargaining agreement as establishing area practice for classification purposes in this present matter.

Even if the Board properly took judicial notice of the Administrator's website information, the Board erred when it blindly credited the biased, inconsistent and disjointed testimony of the union representatives and union contractors over the plain language and common sense application Lang undertook relative to the wage determination classifications (Board Op., pp. 2023-2028).  The Administrator's union-related witnesses simply offered their opinions concerning how they would have classified Lang's equipment.  It is of no surprise, of course, that they testified Lang's equipment should fall into the highest paid classification because, in doing so, they were able to increase Lang's potential liability in this case, thereby benefiting their own interests as competitors to Lang – a non-union contractor.  Their biased testimony is further damaged by their lack of any semblance of a uniform reason for classifying the equipment in Group 1.  Thus, the Board committed legal error in resolving the classification

issue in this case both because it was overzealous in its use of judicial notice and because it adopted defective, disjointed testimony of union officials and union contractors over the plain language and common sense approach utilized by Lang in classifying its employees within Group 4 of the wage determinations.

Finally, the Administrator argued unsuccessfully before Judge Roketenetz that Lang should have sought a "conformance" in this case. A conformance is sought were a contractor may occasionally find that his laborers are performing work that does not fall within any of the wage determinations listed in the applicable wage determination. In such instances, a request for a conformance ruling from the Administrator is to be made through a process outlined in the federal regulations. Specifically, Regulation 29 C.F.R. 5.5(a)(1)(ii)(A) provides:

> The contracting officer shall require that any class of laborers or mechanics *which is not listed in the wage determination* and which is to be employed under the contract shall be classified in conformance with the wage determination. The contracting officer shall approve an additional classification and wage rate and fringe benefits for therefor only when the following criteria have been met:
>
> (1)    *The work to be performed by the classification requested is not performed by a classification in the wage determination*; and
>
> (2)    The classification is utilized in the area by the construction industry; and
>
> (3)    The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination.  (Emphasis added.)

The Board essentially overruled the Judge on this issue (Board Op., fn 20, p. 2023). However, as the regulation specifically states, a request for a conformance is necessary only if the equipment used is not listed in the wage determination. Lang's equipment *is* specifically listed in Group 4. It is all mulching equipment, including a stump remover. Moreover, Mr.

Lang had a specific discussion about the classification of his equipment with Mr. Mark Steutcher of the Michigan Department of Transportation ("MDOT")[11] in which Mr. Steutcher agreed that classification of Lang's equipment under Group 4 was appropriate under the wage determination (Lang, pp. 627-628).  Thus, not only was there no practical or logical reason for Lang to seek a conformance from the Department of Labor, there was no legal requirement for the company to do so.  See, TRL Systems, WAB Case #86-8 (1986); Layne-Northern Co., WAB Case 85-15 (1985); Warren Oliver Co., WAB Case #84-8 (1984).  Furthermore, even if a conformance was hypothetically required in this case, such is required of the contracting officer – *not the contractor*.  Thus, the Board is wrong concerning issues of conformance in addition to its erroneous rulings concerning area practice and identification of Lang's equipment under the plain language of the wage classifications.

> **B.     LANG PROPERLY TOOK PREVAILING WAGE CREDIT WITH RESPECT TO ITS LONGSTANDING PRACTICE OF PROVIDING REIMBURSEMENT OF MEALS AND LODGING EXPENSES ITS EMPLOYEES INCURRED ON THE PROJECTS AT ISSUE IN THIS CASE AND THE BOARD'S CONCLUSION TO THE CONTRARY CONSTITUTES LEGAL ERROR.**

Judge Roketenetz correctly found that Lang properly took credit for its reimbursement of the meals and lodging expenses of its operators on the projects involved in this case.  Not only does Lang's long-standing practice of providing this benefit to its operators qualify as a bona fide fringe benefit under the Davis-Bacon Act, but any such payments also qualify as the equivalent of cash payment under the federal Fair Labor Standards Act irrespective of whether

---

[11]MDOT was the contracting agent on all projects at issue in this case.

such payments are in the form of a fringe benefit under the Davis-Bacon Act.  The equivalent of

cash, obviously, may be counted toward meeting the company's prevailing wage obligations.

Mr. Lang described the origin and operation of the meals and lodging policy at the trial.

He testified that, in 1974, he and his very first employee discussed whether to increase the

employee's wages on out-of-town jobs to cover meals and lodging expenses or, alternatively, to

have the company cover those costs for him as a fringe benefit.  They agreed that covering the

employee's costs as a fringe benefit (as opposed to payment of an equal amount as higher wages)

was more beneficial to the employee because, through company payment of the expenses, the

employee would not have to pay income tax on the amount (Lang, pp. 641-642).[12]  This

arrangement has continued with all of Lang's employees since 1974 (Lang, p. 643). [13]

---

[12]In addition, since there were occasions where they would be out of town but unable to work due to adverse weather conditions, the employee would be guaranteed not to suffer any financial loss occasioned by their employment relationship (Lang, Tr 642-643).

[13]To arrive at an hourly payment/credit figure for all employees for Davis-Bacon purposes, Lang periodically gathered the meals and lodging reimbursements to employees to determine the total cost of all meals and lodging expenses for all employees.  Lang then divided that total number by the total number of hours worked in the field by the employees on both prevailing wage and non-prevailing wage jobs (Lang, pp. 652-654).  In the summer of 1996, upon the advice of Mr. Steutcher of the MDOT (Resp Exb 21, p. 1595), Lang began to show on the certified payroll forms for each employee a deduction of the amount of hourly prevailing wage credit the company was claiming along with a payment of the hourly amount of meals and lodging that was actually provided (Lang, pp. 654-659, 786-788).  In those instances where employees had greater expenses than was being claimed by the company for prevailing wage purposes, employees still received full reimbursement.  Thus, employees were effectively guaranteed full meals and lodging reimbursement, even if Lang was taking only partial prevailing wage credit for such payments (Lang, pp. 659, 679-685; Cameron, pp. 147-151; Dyke, Tr 195-198; Resp Exbs 1 (p. 1560), 2 (p. 1561), 22 (p. 1596), 23 p. 1597)).

Since Lang originally used fluctuating periodic calculations for meals and lodging credit, the company has re-calculated its prevailing wage credit relative to those periods of this case which pre-date Mr. Lang's discussion with Mr. Steutcher.  In this way, Lang presented to Judge Roketenetz and to the Board an even more consistent method of calculating the credit properly belonging to the company (Lang, pp. 660-668; Resp Exb 21, p. 1595).  Those calculations show an average hourly meals and lodging rate for the entire 1995 year and for that part of the 1996 year preceding Mr. Lang's discussion with Mr. Steutcher.

The Davis-Bacon Act, 40 U.S.C. 276a, *et seq*., requires payment of wages at prevailing rates to operators performing work under federal projects valued at $2,000 or more.  The term "wages" is defined within the Act as follows:

(b) As used in sections 276a to 276a-5 of this title the term "wages", "scale of wages", "wage rates", "minimum wages", and "prevailing wages" shall include -

(1)      the basic hourly rate of pay; and

(2)      the amount of –

(A) the rate of contribution irrevocably made by a contractor or subcontractor to a trustee or to a third person pursuant to a fund, plan, or program; and

(B) the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to laborers and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the laborers and mechanics affected,

for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, for unemployment benefits, life insurance, disability and sickness insurance, or accident insurance, for vacation and holiday pay, for defraying costs of apprenticeship or other similar programs, or for other bona fide fringe benefits, but only where the contractor or subcontractor is not required by other Federal, State or local law to provide any of such benefits:

*Provided,* that the obligation of a contractor or subcontractor to make payment in accordance with the prevailing wage determinations of the Secretary of Labor, insofar as sections 276a to 276a-5 of this title and other Acts incorporating sections 276a to 276a-5 of this title be reference are concerned may be discharged by the making of payments in cash, by the making of contributions of a type referred to in paragraph (2)(A), or by the assumption of an enforceable commitment to bear the cost of a plan or program of a type referred to in paragraph (2)(B), or any combination thereof, where the aggregate of any such

payments, contributions, and cost is not less than the rate of pay described in paragraph (1) plus the amount referred to in paragraph (2).

A review of the pertinent statutory language reveals that a contractor may make payment to its operators under any combination of wages or fringe benefits that meet or exceed the wage found to be prevailing.  The forms of payment identified within the statutory language include payment in cash, payment of contribution to a trustee or other third party operating a fund, plan or program, or payment to employees under the assumption of an enforceable commitment to carry out a financially responsible plan or program.  In this present case, Lang's policy of paying the meals and lodging costs of its employees on all projects undertaken by Lang was properly found by the Judge to be credited toward the company's prevailing wage obligations as payment of a bona fide fringe benefit under a commitment to carry out a responsible plan or program, and, alternatively, as a payment of cash toward the hourly rate.

## FRINGE BENEFIT CREDIT

The Act allows for the crediting of "other bona fide fringe benefits" in addition to those specifically enumerated in the statute.  The payments need not be made to a third party, but, alternatively, may be made as payment under a financially responsible program, provided the benefits are not mandated by law.  In fact, the legislative history of the statute indicates Congress intended to provide contractors with wide latitude in meeting prevailing wage obligations through payment of cash or through credit for providing fringe benefits.  The legislative history states:

> There has been a tremendous change in the concept of earnings since Congress enacted the Davis-Bacon Act.  Group hospitalization, disability benefits, and other fringe benefit plans were the rare exception in the 1930'.  Today more than 85 million persons in the United States depend upon the benefits they provide.

18

> *Regardless of the form they take, the employer's share of the cost of these plans or the benefits the employers provide are a form of compensation.*
>
> It has become increasingly apparent that if the Davis-Bacon Act is to continue to accomplish its purpose, prevailing wage determinations issued pursuant to the act must be enlarged to include fringe benefits.

(Emphasis added). <u>G & C Enterprises, Inc.</u> v. <u>Wage Appeals Board</u>, 619 F.Supp 1430, 1432 (D.C. N.J. 1985).

The Act requires that any fringe benefits not identified within the statute itself must be "bona fide" in order to be creditable toward prevailing wage obligations. According to Black's Law Dictionary, "bona fide" means "In good faith; honestly, openly and sincerely. Real, actual, genuine and not feigned." Thus, as long as a financially responsible employer program provides a real benefit to employees, and is not intended as a sham to evade the purposes of the Act, it meets the requirements of the statute and should be creditable to the employer.

Judge Roketenetz correctly concluded that Lang's established policy of paying for the meals and lodging expenses of its employees does, in fact, benefit the employees and constitutes a bona fide fringe benefit. Nothing requires Lang to pay the meals and lodging expenses of its employees. Thus, all witnesses at the trial agreed that, in the absence of Lang's voluntary reimbursement of these employee expenses, the employees would have to pay them out of pocket. In the absence of Lang's payments, such out-of-pocket expenditures would have to be budgeted by employees no differently than employees would have to budget their own uninsured health care costs, educational expenses, unpaid vacations, and individual retirement accounts. Thus, the benefit to employees is obvious.[14] Since the program is not a last-minute sham fabricated by Lang to avoid paying prevailing wages, it is bona fide and properly creditable.

---

[14]Not only do Lang's employees receive an obvious, direct benefit when Lang pays for their meals and lodging expenses, but they receive a more discrete benefit as well – one that was discussed between Lang and the company's very first employee back in 1974 and one that was recognized by Judge Roketenetz. Fringe benefits are not taxed to the employee whereas wages are taxable to the employee. Thus, receiving the value in the form of a fringe benefit benefits the employees even more than if they

## WAGE CREDIT

Lang contends that its policy of providing meals and lodging to its operators is not only creditable as a bona fide fringe benefit, but that the costs incurred by Lang under its policy may, alternatively, be credited as cash payment toward the hourly rate of each employee. The Fair Labor Standards Act, 29 U.S.C. 201, *et seq*., ("FLSA"), requires payment of "wages" in an amount of at least minimum wage. 29 U.S.C. 206(a). "Wages" are defined under the Act as follows:

> (m) "Wage" paid to any employee includes the reasonable cost, as determined by the Administrator to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees: *Provided*, that the cost of board, lodging, or other facilities shall not be included as a part of the wage paid to any employee to the extent it is excluded therefrom under the terms of a bona fide collective-bargaining agreement applicable to the particular employee: *Provided further*, that the Secretary is authorized to determine the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated, or average value to groups of employees, or other appropriate measures of fair value. Such evaluations, where applicable and pertinent, shall be used in lieu of actual measure of cost in determining the wage paid to any employee.

29 U.S.C. 216(m). Thus, is it clear that wages an employer must pay his employees may consist not only of cash, but also of the reasonable cost of furnishing meals and lodging to employees.

The FLSA requires that certain criteria be met with respect to subsistence payments. First, the payment of meals and lodging must be "customarily furnished" by the employer to the affected employees. *Id*. See, also, 29 C.F.R. 531.3(a). The interpretations to the federal

---

were to receive the value in the form of wages.

regulation state in pertinent part: ". . . it will be considered a sufficient satisfaction of this requirement if the facilities are furnished regularly by the employer to his employees . . . ."  29 C.F.R. 531.31.  Of course, there can be no dispute that Lang meets this criteria.  All witnesses agreed that employee meals and lodging were *always* furnished by Lang on *all* of the company's projects (Rosa, p. 79; Stenger, p. 126; Cameron, p. 132; Good, p. 168, 178; Dyke, p. 187-188; Lang, Tr. 632-633).  Second, only the "reasonable cost" of furnishing the meals and lodging may be credited as wages paid by the employer.  The pertinent federal regulations indicate that reasonable costs are not to include any monetary profit to the employer and are not to constitute more than the actual costs to the employer of providing the benefit to employees.  29 C.F.R. 531.3(a) and (b).  Again, Lang meets this test with no difficulty.  Lang does not realize any profit whatsoever from providing meals and lodging to his employees.  Likewise, Lang has not made deductions and corresponding reimbursements beyond the actual costs it incurred in providing meals and lodging to its employees (Lang, pp. 652-654; Stip Exbs G, H, I, J, K, L; Resp Exb 21, p. 1595).

In addition to meeting the statutory tests of the FLSA, Lang's meals and lodging policy also meets the record-keeping requirements of the prevailing wage law.  The federal regulations to the Davis-Bacon Act, specifically 29 C.F.R. 5.5(a)(5), reference that contractors must comply with the record-keeping requirements of the Copeland "Anti-Kickback" Act.  40 U.S.C. 276c. The regulations to the Copeland Act indicate that deductions may be made without application or approval of the Administrator for various items, including:

> (j)  Any deduction not more than for the "reasonable cost" of board, lodging, or other facilities meeting the requirements of section 3(m) of the Fair Labor Standards Act of 1938, as amended, and part 531 of this title.  When deduction is

made the additional records required under section 516.25(a) of this title shall be
kept.

29 C.F.R. 3.5(j).  Mr. Lang testified that all such records were kept (Lang, Tr 675-677).[15]

Thus, Lang's payment to employees for meals and lodging were properly credited by the Judge

as payment of wages toward meeting the prevailing wage obligations of the Davis-Bacon Act.

<u>THE BOARD'S ERRORS</u>

The Board reversed Judge Roketenetz both as to his ruling that Lang could take credit for

meals and lodging either as a fringe benefit or as a wage credit.  In doing so, the Board

committed several errors of law.  These errors center around the <u>Calculus</u> case and the Board's

contorted interpretation of its Field Operations Handbook.

The Administrator argued, and the Board agreed, that <u>Calculus, Inc.</u>, WAB Case No. 93-

06 (1993), stands for the proposition that meals and lodging is not creditable either as a bona fide

fringe benefit or as the equivalent of cash payment.  In <u>Calculus</u>, the Wage Appeals Board

determined that a contractor who paid a per diem amount to employees for meals and lodging on

a special job outside of the company's regular work area could not take credit for those payments

---

[15] Furthermore, the fact that Lang has both reimbursed employees for their out-of-pocket meals
and lodging expenses and has also directly paid for meals and lodging through credit cards or account
arrangements does not negate the company's right to consider the payments and/or reimbursements as
credit toward the hourly rate of the prevailing wage determination.  29 C.F.R. 531.29 specifically states
that:

> Section 3(m) applies to both of the following situations: (a) Where board, lodging, or
> other facilities are furnished in addition to a stipulated wage; and (b) where charges for
> board, lodging, or other facilities are deducted from a stipulated wage. The use of the
> word "furnishing" and the legislative history of section 3(m) clearly indicate that this
> section was intended to apply to all facilities furnished by the employer as compensation
> to the employee, regardless of whether the employer calculates charges for such facilities
> as additions to or deductions from wages.

22

under the Davis-Bacon Act either as a fringe benefit or as cash payment under the FLSA.[16]  The

Board first determined that section 15f18 of the Department of Labor's Field Operations

Handbook provided the appropriate "guidance" on the matter.  That section reads:

> Where an employer sends employees who are regularly employed in their home
> community away from home to perform a special job at a location outside daily
> commuting distances from their home so that, as a practical matter, they can
> return to their homes only on weekends, the assumption by the employer of the
> cost of the board and lodging at the distant location, not customarily furnished the
> employee in their regular employment by the employer, and of weekend
> transportation costs of returning to their homes and reporting again to the special
> job at the end of the weekend, are considered as payment of travel expenses
> properly reimbursable by the employer and incurred for its benefit.  Such
> payments are not considered bona fide fringe benefits within the meaning of the
> [Davis-Bacon and Related Acts], are not part of the employees' wages, and do not
> constitute board, lodging, or other facilities customarily furnished which are
> deductible from the predetermined wage pursuant to [29 C.F.R.] 3.5(j).

Based on this language and on the interpretations to the FLSA, the Board held as follows:

> The application of these legal principals to the facts of this case leads the Board to
> the conclusion that Calculus' per diem payments to its employees were not
> properly creditable toward the required prevailing wage payments.  First,
> Calculus' only witness at the ALJ hearing testified that Calculus did not keep any
> additional records regarding the per diem payments.  Furthermore, the record
> shows that Calculus did not customarily furnish board and lodging to its
> employees, but did so only on the contract involved in this case.  Therefore, the
> per diem payments did not meet the requirements of law and regulation that board
> and lodging must be "customarily furnished" by an employer to its employees in
> order to be creditable toward wages, and that additional records must maintained
> by the employer.  In addition, the record does not support the ALJ's
> determination that the board and lodging was not "primarily for the benefit and
> convenience of the employer," but instead was for the benefit of the employee.
> As aptly stated by the Administrator (Petition, at p. 7):

---

[16]The Board reversed the decision of the administrative law judge who found that the per diem
arrangement primarily benefited the employees and was, therefore, creditable to the employer for
prevailing wage purposes.  The judge ruled that the company was under no obligation to provide meals
and lodging to the employees, that its decision to do so was to provide employees with favorable tax
treatment of the payments, and that the employees received the same or better value as a fringe benefit
than they would have received as wages.

> The evidence in the record reveals that the employees had no choice about whether to accept the per diem in lieu of the full prevailing wage payments just as they had no choice about whether to commute to the job or stay at the hotel selected by Calculus. Since employees were required to remain at the job site during the week and return on Sunday night, there can be no other conclusion than that the facilities were for the benefit and convenience of the employer.

Accordingly, the per diem payments are not permissible deductions from the wages earned by Calculus' employees.

This Board also agrees with the Administrator that the subsistence payments are not bona fide fringe benefits within the meaning of the Davis-Bacon Act. Subsistence payments are not among the fringe benefits enumerated in the Act. The Administrator notes (Petition, at pp. 8-9) that the Davis-Bacon Act does allow the Department of Labor to recognize other bona fide fringe benefits - - other than those specifically enumerated in the Act  - - as those other benefits become prevailing.  The Administrator adds, however (*Id*. at p. 9), that the legislative history of the 1964 amendments to the Act show that Congress viewed the Act as listing all the benefits that were common to the industry at the time of the amendments.  "Since subsistence expenses were common at the time Congress enacted the fringe benefit amendments, but were not enumerated in the Act," states the Administrator, "the Department has never recognized such items as bona fide fringe benefits."  Calculus has presented no argument to this Board that would warrant disturbing the Department's approach to subsistence payments. See Cody-Zeigler, Inc., WAB Case No. 89-19 (Apr. 30, 1991).

Lang submits, and Judge Roketenetz agreed, that the Calculus case actually demonstrates why Lang's policy regarding payment of meals and lodging *should receive prevailing wage credit*.  With respect to the issue of credit as a bona fide fringe benefit, the Board predicated its ruling both in Calculus and the present case on application of federal interpretation 29 C.F.R. 5.29(f) and Section 15f18 of the Administrator's Field Operations Handbook.  The interpretation states that subsistence payments "are not normally payments for fringe benefits under the Act." This language clearly implies, however, that under some situations, subsistence payments *should*

24

be creditable under the Act.  This implication is confirmed by the fact that the interpretation also states that "each situation *must* be separately considered on its own merits."  (Emphasis added).

The Handbook, which the Judge correctly held is not legal precedent, indicates that the Administrator has considered which situations are the normal circumstances where meals and lodging should *not* be considered to constitute bona fide fringe benefits for prevailing wage purposes.  The Handbook section states that meals and lodging should not be credited where employees are "regularly employed in their home community" but who are taken "away from home to perform a special job at a [remote] location" because the payments would not be "customarily furnished" to the employees.  However, as previously explained in detail, this is simply not the case with Lang and its employees.  Lang's employees always work away from their home communities, their jobs are the same at every location, and Lang always pays their meals and lodging expenses.  Thus, Lang's meals and lodging policy presents a situation that is out of the ordinary.  As such, and as previously argued, it represents a compelling circumstance which, if the language of the Administrator's own interpretations are to have any meaning at all, must be considered as a creditable fringe benefit.

The Board has reversed the Judge based in large measure on a contorted interpretation of the language of its Field Operations Handbook relative to the definition of "special job."[17]

_____

[17] It should be noted that the Administrator has argued throughout this case that Lang's meals and lodging policy is not a bona fide fringe benefit because the policy purportedly benefits the company more than it does the employees.  Yet, this exercise of determining "who gets the bigger benefit" is nothing more than an unreliable, subjective task that will ultimately lead to a dead end.  Every transaction completed between two parties has give and take – benefit for benefit.  Ultimately, the give and take should naturally come to rest toward some form of equal benefit.  Logically, if through negotiating a transaction it appears the benefits will be lopsided in favor of one party, the transaction is quelled by the disadvantaged party.  Thus, if a party transacts business with another, it must logically be assumed that the party sees *real* benefit to himself or herself.  Thus, weighing the respective benefits the Lang meals and lodging policy has to Lang and its employees is a colossal waste of time.

Despite the clarity of the <u>Calculus</u> case and the FOH which support the Judge's ruling that "special job" means a job outside the regular course of an employee's employment, the Board at pages 15-16 (pp. 2012-2013) of its Order agreed with the Administrator that the term "special job" means a job where an employer sends employees away from home outside their daily commuting distance, so that, in effect, all of Lang's jobs were "special jobs." Not only does this contention appear odd on its face, but even a cursory examination of the language of the Handbook passage reveals that the Board is wrong. Section 15f18 of the Handbook provides:

> Where an employer sends employees who are regularly employed in their home community away from home to perform a special job at a location outside daily commuting distances from their home so that, as a practical matter, they can return to their homes only on weekends, the assumption by the employer of the cost of the board and lodging at the distant location, not customarily furnished the employee in their regular employment by the employer, and of weekend transportation costs of returning to their homes and reporting again to the special job at the end of the weekend, are considered as payment of travel expenses properly reimbursable by the employer and incurred for its benefit. Such payments are not considered bona fide fringe benefits within the meaning of the [Davis-Bacon and Related Acts], are not part of the employees' wages, and do not constitute board, lodging, or other facilities customarily furnished which are deductible from the predetermined wage pursuant to [29 C.F.R.] 3.5(j).

The Board's definition of "special job" is obviously wrong because it results in an odd and unnecessary redundancy within the first sentence of this provision. Certainly, if a "special

---

It is somewhat difficult to discern exactly how the Board, in reversing the Judge, has treated the Administrator's argument concerning the balancing of the benefits. Basically, the Board concluded that Lang's payment of meals and lodging was "illusory or not genuine," but it never really stated how it reached that conclusion. On the one hand, the Board stated that it rejects a benefit weighing analysis (Board Order p. 2010, "we reject the ALJ's 'benefit to the employee analysis'"), but it then contradicted itself and stated that Lang shouldn't get credit for the payments because they were "incurred for its benefit" (Board Order, p. 2012). Assuming that the Board has engaged in the weighing benefits, Lang will explain in detail, *infra*, that such an exercise runs contrary not only to federal case law, but also to the express and plain language of federal regulations promulgated by the Administrator herself under the Fair Labor Standards Act and thus warrants reversal by this Court.

job" were to be defined as any job which occurs "at a location outside daily commuting distance from [employees'] homes so that, as a practical matter, [employees] can return home only on weekends," then why would the term "special job" even need to be placed within the sentence? Furthermore, there is nothing necessarily "special" about jobs performed a far distance from the employees' homes. Moreover, had the Administrator wished to provide a label for the phrase "at a location outside daily commuting distance from employees' homes ...," the Administrator would certainly have picked a more descriptive label such as "distant jobs" – not "special jobs." Clearly, an objective reading of the Handbook provision reveals that the first sentence constitutes a *list of conditions* which, if met, result in disqualification of an employer from credit for meals and lodging. The express conditions for disqualification are as follows:

- employees must be regularly employed in their home community;

- employees must be sent away from home;

- employees must be sent to work on a special job;

- employees must be sent to a project outside their daily commuting distances so that as a practical matter they can only return home on weekends; and

- the food and lodging of employees must not be customarily furnished by the employer in their regular employment.

Given this list of separately identifiable conditions, Judge Roketenetz properly concluded that a "special job" must be one that, contrary to the last condition referencing "regular employment," occurs outside the regular course of employment (D&O, p. 1741).[18] The Board's reversal of the

---

[18] The Board also erred in its ruling at page 16 (p. 2013) of its Order when it ruled that the ALJ wrongfully found Lang to have customarily furnished meals and lodging to its employees on all jobs. The Board appears to have correctly mentioned that an employer could potentially take fringe benefit credit for meals and lodging if it customarily provides those benefits to employees in their regular employment. While Lang is not exactly sure what the Board is trying to say thereafter, it appears that the Board made an unconnected leap to an erroneous conclusion that Lang did not customarily provide meals

Judge decision is legally erroneous because it is at odds with its own policy statements and defies common sense. [19]

The <u>Calculus</u> case also demonstrates that the Board should approve meals and lodging as wage compensation under the right set of circumstances.  There, the Board reversed the ALJ and rejected Calculus' claim for wage credit not because that employer raised a novel legal theory, but because Calculus failed to show that its per diem policy met the appropriate FLSA tests.  Lang's meals and lodging policy, on the other hand, does meet all applicable FLSA tests and, therefore, should be credited.  Specifically, the Board found that Calculus did not keep the additional records it was obligated to keep concerning its per diem policy.  As previously demonstrated, Lang has kept all applicable records.  Calculus failed to show that it "customarily" furnished the per diem to its employees.  As demonstrated above, Lang always pays the meals and lodging expenses of its employees on all jobs.  Finally, the Board found that the per diem

---

and lodging because all of its jobs were out of town.  Of course, all witnesses agreed that Lang provided meals and lodging at all times.

[19] The Board has previously recognized that the Administrator should not "pick and choose" between which fringe benefits to credit and not to credit can lead to anomalous results.  In <u>Collinson Construction Co.</u>, WAB Case No. 76-09 (1977), reconsideration denied at WAB Case No. 76-09 (1978), the Board determined that it was improper for the Administrator to disallow a bona fide fringe benefit credit to the employer simply because the Administrator had not found that fringe benefit to be prevailing in the area.  The Board ruled that to disallow the credit would have the effect of discriminating against the contractor based on the type of fringe benefits he provided.  The Board reasoned that the employer could pay the exact same amount to employees in the form of wages instead of fringe benefits (since, either way, it constituted a business expense to the employer), but that payment in the form of wages would work to the detriment of employees, as they would have to pay income tax on the amount received.  Thus, the Board ruled for the employer, thereby sparing that company from having to pay its employees *twice* for the same benefit and thereby sparing the employees from having to pay tax on compensation they would receive under an inevitably modified employer pay practice.  Likewise, Lang contends that the Board's current ruling against Lang's credit for meals and lodging should be reversed in order to prevent Lang and its employees from being penalized for the type of fringe benefits Lang provides, just as the Administrator was prevented from penalizing the employer and employees in <u>Collinson</u>, *supra*.

policy was instituted for the employer's primary benefit.  Key to this portion of the Board's ruling was that the employees had "no choice about whether to accept the per diem in lieu of the full prevailing wage payments just as they had no choice about whether to commute to the job or stay at the hotel selected by Calculus."  *Id*.  Contrary to Judge Roketenetz, the Board in the present case has ruled similarly to the Board in Calculus.  Specifically, the Board ruled that Lang's meals and lodging policy primarily benefited Lang because the benefit was provided out of town, the employees were required to stay where Lang made arrangements, and the employees had to share rooms (Board Order, p. 2016).

The Board's decision is legally erroneous because it is not necessary to engage in a fruitless, theoretical debate over "who gets the bigger benefit" from Lang's meals and lodging policy – Lang or its employees.  This is because the Department of Labor and the federal courts have already determined that meals and lodging are *presumed* to primarily benefit *employees*. While the Board in a footnote references language from its Field Operations Handbook (Board Order, fn. 13, pp. 2014-2015), Lang calls this Court's attention to the more relevant and legally compelling regulations to the FLSA.  In this regard, 29 C.F.R. 531.32(a) provides for a description of "other facilities" that may qualify for section 3(m) treatment under the FLSA stating that "'[o]ther facilities,' as used in this section, *must be something like board or lodging*." The interpretation goes on to indicate various "facilities" that do not qualify for section 3(m) treatment because, according to the Administrator, they are provided primarily for the employer's benefit, yet none of the items concern meals and lodging.  More importantly, the regulation concludes the list with the following statement: "*[o]n the other hand, meals are*

***always*** *regarded as primarily for the benefit and convenience of the employee*." (Emphasis added).[20]

In addition to the Department of Labor's own regulation, the federal courts have made clear that a strong presumption exists that lodging is also regarded as primarily for the benefit of employees. In <u>Soler, *et al.*</u> v. <u>G & U, Inc.</u>, 833 F.2d 1104; 28 WH Cases 593 (2nd Cir. 1987), *cert. den.*, 488 U.S. 832; 102 L.Ed.2d 64; 109 S.Ct. 88; 1 W & H Cases 2d 168 (1988), farm workers were required by their employer to work on farms far from their homes. The employer provided lodging and treated the value of the lodging as wages to the employees. Finding for the employer, the administrative law judge ruled that the lodging was for the primary benefit of the workers. The Board affirmed in accordance with the pertinent regulations and interpretations. On judicial review, however, the federal district court reversed, rejecting the principle advanced by the Administrator that section 3(m) creates a presumption that "housing facilities, like meals," are a basic necessity for human existence and should be characterized as wages. *Id*. at 1107.

The Second Circuit Court of Appeals reversed the district court. First, it examined and described the import of the plain meaning of the statutory language of section 3(m) itself:

> The meaning and intent of this statutory language is clear: *Congress explicitly authorized a wage paid by an employer to an employee to include the reasonable cost of lodging, board, and other facilities which confer similar benefits on employees, and which are customarily furnished by the employer to his employees.* Thus, Congress recognized that *housing facilities, like meals,* are

---

[20] Rejecting Lang's argument, the Board indicated at page 18, footnote 14 (p. 2015), of its Order that the regulation cited by Lang does not apply to "travel expenses." The Board fails to realize, however, that "travel expenses" are not necessarily the same thing as meals and lodging. The Board also contends that the cross-references to 29 C.F.R. 778.217 demonstrate that costs incurred in relation to travel for an employer are not creditable. However, a review of the regulation does not show any legal support for the Board's rejection because meals and lodging are not mentioned as travel expenses. The bottom line is that Lang paid the meals and lodging of all of its employees on all jobs so that the payments are not properly classified as "travel expenses."

essential for human existence and *are ordinarily paid for from an employee's earnings*.  An employee has to reside somewhere, and therefore rental payments for the employee are usual and customary items of his or her living expenses.  If an employer absorbs this expense *for an employee, it is only equitable and reasonable that the employee "reimburse" the employer from wages earned.* Congress, however, to ensure adequate wages and to prevent employer profiteering, see <u>Brooklyn Savings Bank</u> v. <u>O'Neil</u>, 324 U.S. 697, 706-07, 89 L. Ed. 1296, 65 S. Ct. 895 (1945), required that the housing credit for an employer be limited to the "reasonable cost" of the lodging furnished the employee.  <u>Davis Bros., Inc.</u> v. <u>Donovan</u>, 700 F.2d 1368, 1370 (11th Cir. 1983).  It further mandated that the Administrator monitor housing deductions from employees' wages and, in the event of a dispute, resolve the issue through appropriate administrative proceedings.  (Emphasis added).

*Id*. at 1108.  The court then examined the pertinent regulations:

While the explicit reference to **housing and board** in §3(m) implies that reasonable costs of those facilities are **presumptively compensation**, the statute leaves open the question whether an employer's payments for "other facilities" are includable in an employee's wage.  Presumably, Congress recognized that employer-furnished facilities may vary from job to job and over time, and intended that the Administrator determine the issue of what "other facilities" should be included as wages on a case-by-case basis.

It seems evident that §531.3(d)(1) was promulgated to provide guidance for the identification of items that may be considered to be *in pari materia* with "board and lodging":

> The cost of "facilities" found by the Administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.  (Emphasis added)

In practical effect, the balancing of benefits test established by the Regulation provides a common-sense and logical approach to resolve the reasonableness of costs for facilities **other than lodging and board** that may be counted toward the payment of an employee's wage: If the item in question primarily benefits the employer, the cost of that facility will not be recognized as reasonable and will not be an allowable inclusion in an employee's wage; *if the item primarily benefits the employee, it will be construed to be a reasonable cost,* **like housing and meals,** *within the meaning of* §*3(m).*

Other regulations issued pursuant to the authority of §3(m) as well as decisional law comport with this analysis.  See, e.g., 29 C.F.R. §531.3(d)(2) (an employer's

expenses for tools of the trade, construction by and for the employer, and certain uniforms are not reasonable costs deductible from wages); 29 C.F.R. 531.32 ("other facilities" within the meaning of §3(m) must be something *like board or lodging*). . . .

*Id*. at 1109.  Having determined that meals and lodging are both presumptive compensation and

are provided to employees for their benefit, the Court of Appeals held:

> . . . [w]e regard the language of the statute authorizing a wage deduction for reasonable housing costs as conclusive and binding both on the Administrator and the reviewing court.  See Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 64 L.Ed.2d 766, 100 S.Ct. 2051 (1980).
>
> On the facts, our independent review of the pleadings and evidence in the administrative record, see Camp v. Pitts, 411 U.S. 138, 143, 36 L.Ed.2d 106, 93 S.Ct. 1241 (1973); Virginia Agricultural Growers Ass'n v. Donovan, 774 F.2d 89, 93 (4th Cir. 1985), reveals that *the Administrator properly relied on the statute, which we have determined creates a **presumption of deductibility**, thereby **eliminating the necessity** for the Administrator **to** collect, sort and **weigh benefits** under the Regulation.*

*Id*. at 1110.  Thus, not only are meals and lodging expressly identified as compensation under the

plain meaning of section 3(m), but there is no need to engage in any "balancing of benefits test"

between Lang and its employees under the meals and lodging policy.[21]

The Board's final two reasons for finding Lang's payment of meals and lodging not

creditable are that the employees had to share rooms and that they were required to stay in hotels

---

[21]Even if one were to "balance the benefits," the benefits received by the employees are, as Judge Roketenetz found, far greater than that received by Lang.  All that Lang receives is a more realistic hope that its employees will be more rested and perhaps more ready to work at the start of the day – a legitimate and universal expectation of every employer.  The employees, on the other hand, receive actual payment of an expense that they would otherwise have to pay themselves, out-of-pocket.  Not only does this assist in cash flow for the employees (see, Lang, Tr 657) but they are spared the hassle of having to make lodging arrangements for themselves.  Hence, they are free to spend their time off doing what they please (i.e., more "beer time," see, e.g., Good, Tr 166-167).

selected by Lang. [22]  With respect to the sharing of rooms, the Board relied on the following

passage from <u>Laffey</u> v. <u>Northwest Airlines, Inc.</u>, 642 F.2d 586, 587 (DC Cir. 1980):

> Our continued study has revealed that as a general rule provision of
> accommodations and funds for the cleaning of uniforms will not constitute wages.
> *Nevertheless, we find that in the case before us the single rooms and cleaning
> allowances really were provided* **primarily** *for the* **benefit** *of the* **employees**
> *receiving them, and that for that reason they* **constituted** *a part of the employees'*
> **wages** *for purposes of that Act.*  (Emphasis added).
> Of course, this passage does not indicate that a single room is creditable whereas a shared

room is not.  Such a notion is quite silly.  There is no rational basis for the Board to conclude

that sharing a room is a detriment to an employee such that the free room is not a fringe benefit.

It may very well be that most people might prefer to room with a fellow employee as opposed to

staying alone when away from home.  In any event, such speculation by the Board does not

constitute sound law.  Thus, the Board's partial quote from <u>Laffey</u>, cannot serve to detract from

the numerous cases cited by Lang which demonstrate that, even if the Board were permitted to

"balance the benefits" in this present case, the facts and applicable law compel a finding that

Lang's employees received the primary benefit of Lang's meals and lodging policy.

Finally, the "issue" that employees had no choice in the meals and lodging program

provided by Lang so that the program could not truly benefit them, is no longer of legal import

as the apparent "voluntariness" test for wage credit discussed in the <u>Calculus</u> case, found at 29

C.F.R. 531.30, is no longer of any valid legal precedence.  In <u>Herman</u> v. <u>Collis Foods, Inc.</u>, 176

F.3d 912; 5 W & H Cases 2d 343 (6th Cir. 1999), the Sixth Circuit Court of Appeals addressed

---

[22]While Mr. Lang testified that there were no stipulations concerning where employees were to
eat or stay, the Administrator's witnesses testified that they did not get to choose whether they could be
paid a per diem or whether they could select their own lodging.  The Board obviously credited the
testimony of Lang's employees over Mr. Lang.

this very issue, rejecting as no longer viable the precept of 29 C.F.R. 531.30 that employers may

satisfy wage obligations only by providing facilities which are "voluntary and uncoerced."

     In <u>Collis Foods</u>, the federal district court ruled that the employer's meal credit plan,

under which a uniform amount was deducted from each employee's cash wages in exchange for

meals, was permissible.  The Administrator appealed.  The Court of Appeals found that the

FLSA was silent as to whether employees must be given a choice of accepting a meal in lieu of

wages and that it was the Administrator who had inserted the voluntariness requirement through

her regulations.  After examining prior case law, the Court held the regulation invalid, ruling:

> Nothing in §203(m) indicates that employers must give their employees a choice
> of whether to accept meals.  Instead, the inquiry focuses on whether the meals are
> "customarily furnished by" the employer.  The use of this passive language in the
> provision supports the Eleventh Circuit's conclusion the § 203(m) looks to
> employer, not employee, behavior.  Finally, to the extent that an employer's
> power to force employees to accept non-cash benefits in lieu of cash wages puts
> the employees at risk of exploitation, the FLSA protects against that risk by
> prohibiting employers from including a profit in their calculation of the
> reasonable cost of meals furnished.  See 29 C.F.R. § 531.3(b).  The district court
> therefore correctly concluded, as a matter of law, that Collis Food's meal-credit
> plan was valid even though its employees have no choice but to accept the plan.
>
>     * * *
>
> On appeal, the Secretary does not directly argue that this court should impose a
> voluntariness requirement upon Collis Foods.  Rather, she focuses upon the
> requirement in § 203(m) that employers charge no more than the "reasonable
> cost" of non-cash benefits furnished in lieu of cash, and upon the interpretive
> regulation that defines "reasonable cost" as "actual cost."  See 29 C.F.R. §
> 531.3(a) (1998).  The Secretary asserts that Collis Foods's practice of deducting
> the cost of an average Waffle House meal from the paycheck of every employee
> on a per-shift basis regardless of whether the employee consumes such a meal
> violates the statute and the interpretive regulation.

*Id.* Slip Op. at 15.  Thus, even if it is assumed that Lang's meals and lodging policy was forced

on employees, which it was not, this Board's reliance on this factor is in error.

Clearly, the payments made under Lang's long-standing meals and lodging policy should be treated as a bona fide fringe benefit or as credit toward wages, or any combination of both. The program was developed for the benefit of its employees and allows them to take advantage of favorable tax treatment on the payments – a clear benefit to them.[23] If Lang were not to pay for their meals and lodging, the employees would have to pay those expenses themselves. A ruling against the company on this issue will result in the company modifying its pay policies so that employees will receive a slight increase in wages but will receive nothing for meals and lodging. This, of course, will result in an increased tax burden for employees as well as cash flow problems for them on the job sites. It will have no effect on Lang in the future, since the payments it makes are deductible either way. Lang will, however, suffer immediate loss under an adverse ruling in this case because it would have to pay all of its former employee *twice* where one payment should have been sufficient. Only the employees who have quit the company will have reason to celebrate because they, of course, would be receiving a windfall. Thus, even the practicalities of the case demonstrate that the Board's Order is legally erroneous and must be reversed by this Court.

### C.   LANG PROPERLY CALCULATED THE HOURLY AMOUNT OF PREVAILING WAGE CREDIT IT TOOK WITH RESPECT TO HEALTH INSURANCE COSTS IT PROVIDED TO EMPLOYEES

---

[23] According to its Order, the Board apparently has rejected this obvious benefit to employees because (1) it doesn't understand the tax code, (2) no two employees would have the exact same tax burden, and the Board previously gave no credence to another employer's similar argument in Calculus (Board Order, fn. 16, p. 2016). Of course, unlike the Board, this Court should not fear to take judicial notice that fringe benefits are not taxable to employees, whereas wages are. This Court should also have no difficulty taking judicial notice of the fact that, even if employees have differing tax burdens, every employee would nevertheless benefit to some degree from reducing his or her tax burden with less gross income. Finally, this Court should recognize that the fact that the Board made an erroneous ruling before in a prior case (the Board gave no credence to the tax benefit employees enjoyed in Calculus), is not justification for the Board to be permitted to make the same mistake a second time.

**WORKING UNDER THE PROJECTS AT ISSUE IN THIS CASE
AND THE BOARD'S CONCLUSION TO THE CONTRARY
CONSTITUTES LEGAL ERROR.**

The Board determined that Lang improperly calculated the fringe benefit credit it took on the six federal projects at issue in this case.  Specifically, the Board ruled that some of the employees were not actually covered by insurance during the time Lang was taking credit for making the payments due to the fact that there was a waiting period with the insurance company that needed to be satisfied (Board Order, p. 2019).  The Board also ruled that the calculations for this benefit should have been made individually and on a monthly basis because Lang paid varying rates for the insurance and because the insurance premiums were paid monthly (Board's Order, pp. 2017-2018).  Lang responds that both legal precedent and common sense dictate that the Board committed legal error which this Court should reverse.  Lang's method of calculation is proper because it is sound and more equitable to all the parties involved.  The Judge agreed and so should this Court.

Ms. Bliek testified (Bliek, p. 500) and the Board agreed that the Administrator's calculations were preferred because they took into account the varying premium payments and varying work hours for each employee each month.  Apparently, the agency and the Board believe that an employee who worked only a few hours in one month would have a very high fringe benefit value and, in a busy month, would have a very low fringe benefit value.  Lang contends this individualized monthly calculation method is unnecessary under the Act and that it leads to absurd results.  In reality, the value of insurance is measured in the actual coverage an employee receives − not in the amount or frequency of premium that is paid to obtain that coverage.  Thus, to put the value of insurance coverage into an hourly figure is, by its nature, an

artificial task.  Even so, the Board's ruling misses the mark badly.  Lang examined the figures
Ms. Bliek had calculated (adopted as correct by the Board) and displayed them on a spreadsheet
(Resp Exb p. 1604). That spreadsheet reveals extreme variations from month to month in the
value of the insurance benefit employees received, even though the value to the employee really
remained at all times the same.  For example, the Administrator's calculations show that the
value of Mr. C. Lynk's insurance package in April, 1997, equated to $7.61.  The calculations
show that the value of that same insurance package dropped to $1.15 for the next calculated
month.  That is a difference of 85% even though Mr. Lynk experienced absolutely no
depreciation in value in his insurance protection provided by Lang over that same period of time!
 (See, Lang, pp. 712, 716-717, 775-777).  The facial absurdity of the Administrator's
calculations approved by the Board along with the bookkeeping nightmare which necessarily
accompanies it indicate that her method must be rejected out of hand.  Judge Roketenetz agreed
with Lang, rejecting the Administrator's method of calculation and characterizing it "artificial
and overly complex" (ALJ, Op., p. 1808).

Since Lang was informed by the Administrator prior to the trial that the calculations
should be "actual," Lang re-computed its health insurance fringe benefit credit using actual
premium payments and actual hours worked by all employees on a yearly basis (Lang, pp. 710-
711).[24]  Lang entered into evidence spreadsheets showing the monthly premium payments made
to employees who worked seasonally for the company and another spreadsheet for the

---

[24]Previously, Lang had calculated fringe benefit credit based on dividing an industry standard
work month of 176 hours into the total monthly premiums paid on employee health insurance.  The
resulting hourly number was used for the fringe benefit credit on the particular project for the duration of
the project.  (See, Adm Exb 2, p. 813).

employees who worked from year to year (Resp Exbs pp. 1605, 1606).  Lang then entered into evidence a spreadsheet showing the total yearly amounts paid to each employee and the total hours worked by the employees for those respective years (Resp Exb p. 1607).  From these actual figures, Lang arrived at an average yearly hourly amount which most fairly constitutes the hourly value of the health insurance it provides to employees (Lang, pp. 724-730, 777-782).  Not only does the amount fairly reflect the true costs of the insurance provided to employees per hour, but it avoids the bookkeeping nightmare that the Administrator and the Board apparently prefer.

The Board rejected Lang's annualized calculations based solely on the language of the Field Operations Handbook which indicates that premiums paid on a monthly basis should result in Davis-Bacon credit on a monthly basis.  Significantly, however, case law indicates that calculations averaged on an annual basis are permitted.  In <u>Miree Construction Corp.</u> v. <u>Dole</u>, 930 F.2d 1536; 30 W & H Cases 502 (11th Cir. 1991), the Wage Appeals Board ruled that a contractor who made payments in excess of that which represented actual cost of an apprenticeship program could not take credit for such costs.  Within its ruling, *the Board contended* that the hourly equivalent to the payment into the apprenticeship fund needed to be computed on the basis of all jobs (not just Davis-Bacon jobs) *on an annualized basis*.  The federal district court and the Eleventh Circuit Court of Appeals affirmed the Board's decision. In this regard, the Court of Appeals ruled first that an employer may only receive Davis-Bacon credit for contributions that are reasonably related to the cost of the benefit provided.  It then turned its attention to the "annualization" issue, stating as follows:

Having determined the amount of contributions creditable toward Miree's Davis-Bacon prevailing wage obligations, that amount must be converted into an hourly rate.  The Administrator calculated this amount by dividing the total contributions made for a given classification of employee during the year by the total number of hours worked in that classification during the year on both government and non-government work.  The Administrator reasoned that this method of calculation, the "annualization" principle, prevented employers from receiving Davis-Bacon credit for fringe benefits actually paid to employees during non-Davis-Bacon work.

*Id*. at 1545.  Finding for the Administrator, the Court held:

The annualization principle is simply a method of computing the appropriate amount of certain contributions to be credited for Davis-Bacon purposes.  Under the statute, employers are free to pay their employees in cash, fringe benefits, or "a combination thereof," so long as the total wage is no less than the prevailing wage in the locality.  If an employer chooses to provide a year-long fringe benefit, rather than cash or some other fringe benefit, the annualization principle simply ensures that a disproportionate amount of that benefit is not paid for out of wages earned on Davis-Bacon work.

*Id*. at 1546.  See, also, Tom Mistick & Sons, Inc. v. Reich, 54 F.3d 900; 2 W & H Cases 2d 1285

(D.C. Cir. 1995), cited by Judge Roketenetz in agreement with Lang's position (ALJ, pp 22-23).

In this present case, the Administrator, with Board approval, has performed an "about-face" from

her previous position in Miree.  Annualized fringe benefit credit was appropriate in Miree

because the fringe benefit was designed to apply to the employees for the full year and the

Administrator did not believe it was appropriate to have the benefit disproportionately applied to

non-government jobs.  Lang submits that the same is true in this present case.  While Lang pays

health insurance premiums on a monthly basis, it provides health insurance coverage to all

employees *year round*.  Moreover, as demonstrated through Respondent's Exhibit 36, p. 1617,

adherence by the Board to the Administrator's reversed position in this case would lead to a

substantial subsidization of the company's health insurance payments by the non-Davis-Bacon

jobs (Lang, pp. 730-731).  Thus, there exist no valid reasons for the Board to insist that Lang

make monthly calculations of its health insurance fringe benefit credit and every valid reason for

Lang to have calculated its benefit on a yearly basis for all jobs.

Case law also supports Lang's position that it is permissible to compute the hourly rate

for fringe benefits as an average for all employees.  The costs that Lang incurred for meals and

lodging were properly averaged between all employees to arrive at a uniform hourly rate, even

though it is highly unlikely that each employee ordered the exact same meals on every job.

Significantly, in <u>Collis Foods</u>, *supra*, the Court of Appeals addressed this very issue.  It stated:

> "the sole issue before this court is the legal question of whether the FLSA permits
> Collis Foods to deduct the average cost of a meal from every employee's
> paycheck on a per-shift basis."

Slip Op. at 10.  The Court then held:

> Section 3(m) of the FLSA states that the fair value of meals provided as a portion
> of wages may be based upon the "average cost to the employer . . . ."  *Id*.  Such
> average may be "used in lieu of actual measure of cost in determining the wage
> paid to any employee."  *Id*.  In order to estimate the average cost of meals
> provided to Collis Food's employees, the company provided McCarthy with
> records of the cost of food that it purchased, along with records of its other
> operating costs.  The district court, although it disagreed with McCarthy's method
> of calculating the cost of the average meal, reviewed the records on its own and
> found that the average cost of a meal under the meal-credit plan was greater than
> the amount of the wage deduction that Collis Foods took for all of the years in
> question but one (and as to that one year the overage was found to be minimus).
>
> On appeal, the Secretary does not contest the district court's independent finding
> that Collis Foods deducted no more than the average cost of a meal.  Instead, she
> asserts that the practice of deducting the average cost is itself impermissible.  As
> noted throughout this opinion, however, we rejected this argument.

Slip Op. at 23-24.  Since it is obviously permissible for Lang to average the meals and lodging

costs it expends for all employees, the Judge properly concluded this issue in Lang's favor.

It should be noted that Lang's calculation of an average hourly Davis-Bacon credit for all

employees receiving health insurance appears to be very similar to that of the union plan which

the Administrator deems acceptable.  Like the union plan, Lang's system calculates to a fixed credit number for all employees, despite variations in coverage between employees (Hamilton, pp. 265-267; Lang, pp. 729-730).  Also, like the union system, Lang's method of calculation spreads the total health insurance costs to cover even those periods of time where employees may need to satisfy a waiting period (Lang, pp. 729-730; Adm Exb 2, p. 813).  Interestingly, this method appears to be permitted even under the Administrator's own handbook.  Section 15f12 of the handbook provides that "it is not required that all employees participating in a bona fide fringe benefit plan be entitled to receive benefits from that plan at all times."  Accordingly, the Board's reversal of Judge Roketenetz in this regard is erroneous.

Similarly, the Administrator's position against Lang (ratified by the Board) that prevailing wage credit can be given only where the payments for an employee's coverage are exactly proportional to the benefit received by the employee and only where the employee has actually received the benefit, is contrary to the way health insurance credit is provided to countless unionized construction firms across the country under collective bargaining agreements which the Administrator obviously finds consistent with her administration of the Davis-Bacon Act.  The standard practice of employers, including those in the construction industry, is to provide health insurance coverage to employees after a short waiting period, usually 60 or 90 days after commencing employment.  It is also standard practice for employers, including those in the construction industry, to provide varying degrees of coverage, usually single, single plus spouse, or full family coverage.  Insurance offered by unionized construction contractors through union health plans identified in collective bargaining agreements are no different, as they, too, have certain waiting periods (60 or 90 days) and provide for varying

41

degrees of coverage (single, spouse, and full family).  Thus, there is no difference between the manner by which Lang provides its health insurance coverage and the manner by which unionized construction contractors provide health insurance coverage.

The parties stipulated to several exhibits at the trial, including Exhibit GG, p. 1553 – the 1998 collective bargaining agreement between the Michigan Road Builders Association and the International Union of Operating Engineers, Local 324, *et al*.  That agreement provides, at pages 10-12, p. 1554, for the payment of health insurance premiums to the Union by unionized construction contractors on behalf of their employees in a set amount of $4.00 per hour worked. These payments must be made in the same amounts, on all employees, at all times, for any work performed that is covered under the contract.  Thus, the payments are made on behalf of an employee even if the employee may be a recent hire caught in the waiting period receiving no tangible health insurance benefit, and even if the employee is covered only with single coverage when the more costly full coverage is also available and utilized by other employees. Significantly, unionized contractors working on prevailing wage projects pay the $4.00 payments to the Union and take credit for same on their prevailing wage certified payrolls even though, like Lang, their employees might technically not be receiving precisely the same coverage and even though their employees may not even be receiving coverage at all because of a short waiting period.  Clearly, Lang's method of calculation is no different from the method used by unionized contractors under collective bargaining agreements for taking prevailing wage credit for the payment of health insurance premiums.  Since the Administrator and the Board certainly have no problem with the "union method" of taking prevailing wage credit, and since

Lang's method for credit is indistinguishable from the union method,[25] the Board cannot logically, equitably or lawfully disallow Lang's calculation of health insurance credit in this present case.

> **D.    LANG PROPERLY TOOK PREVAILING WAGE CREDIT FOR THE PAYMENT IT MADE AS VACATION PAY TO EMPLOYEES WORKING UNDER THE PROJECTS AT ISSUE IN THIS CASE, EVEN IF LANG MAY HAVE INCLUDED THOSE PAYMENTS ALONG WITH BONUS PAY, AND THE BOARD'S CONCLUSION TO THE CONTRARY CONSTITUTES LEGAL ERROR.**

Lang should receive full credit for the extra payments of cash it made to its employees working on the DBA-3 project because it made the payments as vacation pay, but, more importantly, it made the payments with the specific intent to cover the company's prevailing wage obligations.[26]  The Board's denial of credit to Lang places form over substance and results in an unjust forfeiture of approximately $11,000 dollars to Lang with a corresponding unwarranted windfall to Lang's former employees.

Prior to the Kent County Airport project, DBA-3, Lang had never provided vacation pay to its employees (Lang, Tr 685).  It did so on the Kent County project in 1995 specifically to meet Davis-Bacon Act fringe benefit requirements (Lang, Tr 686).  Mr. Lang testified that he chose vacation pay because it was the kind of fringe benefit that could be paid out periodically

---

[25]In an apparent attempt to bypass Lang's arguments in this regard, the Board ruled at page 22 of its Order (p. 2019) that:  "Lang proffered no evidence to support the proposition that it made [contributions for ineligible employees during their waiting periods]."  This ruling constitutes error because Lang has no obligation to put forward any proof affirmatively demonstrating the propriety of its payments in this case.  The Administrator bears the burden of proving her case against Lang.  The Board's ruling shifted onto the accused (Lang) the Administrator's burden of proof in prosecuting this case, a ruling which must be overturned.

[26]Respondent's Exhibit 37, p. 1608, DBA-3, shows the number of hours worked on the job and the vacation credit taken.

over the year which would allow the company to meet any deficiencies it might have in the

prevailing wage obligations during the project (Lang, Tr 686).  Mr. Lang explained how such

deficiencies could arise:

> Because of this hourly fringe benefit requirement and the way that our fringe
> benefits are paid, which are not really by the hour, there is difficulty in knowing
> an established hourly rate.  So we would be into the job for a while and see how
> these costs would be calculated on an hourly basis.  And then when you would
> determine if there was a deficiency, then I thought that vacation pay would be a
> good way to rectify that so that we met the requirement for fringe benefits.
>
> ***
>
> I told [the company bookkeeper] to make some calculations based on
> representative weeks and come up with what a good representative number would
> be for the value of our fringe benefits and initially she gave me some figures.  I
> determined that it was deficient.  So then I decided to make payments that I knew
> would cover the deficiency (Lang, Tr 685-686).

Based on the calculations put together by the company's bookkeeper, Lang determined

that the average hourly deficiency was approximately $2.50 per hour.  The company then paid

employees vacation pay three times in the summer of 1995 to cure the deficiency.  Near the end

of the year, Lang examined its fringe benefit payout again and determined that the average actual

hourly amount of deficiency was actually $2.46.  The company then made a final vacation

payment to employees in December, 1995.  Included with the payments were additional bonus

amounts which brought the checks to round numbers.  This was done to ensure that there would

be more than enough payment to meet full compliance with Davis-Bacon fringe benefit

requirements in the event of any errors or changing fringe requirements (Lang, Tr 52-55, 687-

690; Adm Exb 4, p. 1564; Resp Exb 26, p. 1598).

Judge Roketenetz ruled that, while vacation pay is creditable toward Davis-Bacon obligations, Lang's payments to employees were not creditable because they were not specifically referred to employees as "vacation pay" and were more aptly referred to as "bonus." He found that the payments did not fit within the scheme of the regulations because they were not made on a quarterly or shorter periodic basis.  The Board affirmed.

The Board's ruling denying credit to Lang based on a technicality places form over substance and results in an unwarranted windfall to employees and an unjust forfeiture to Lang. The evidence reveals that substantial portions of the extra payments made to employees on DBA-3 were made by Lang specifically as vacation pay to meet its prevailing wage obligations. Payments were not made willy-nilly, "out of the kindness of Lang's heart," or as some form of reward for the general efforts of the employees on all jobs.  Lang's very clear intent was to pay money to the employees *specifically and deliberately to meet prevailing wage obligations*.  Since the extra payments were made specifically on the Kent County Airport project and specifically to meet prevailing wage fringe benefit obligations, it constitutes legal error for the payments to be discarded simply because the Board believes Lang was imprecise in his labeling of them.

The Board's ruling denying credit to Lang, if allowed to stand, essentially provides employees working on DBA-3 with a second payment of vacation pay and works a forfeiture of Lang's original payment to employees.[27]  If this Board's affirmance of the Judge's ruling is allowed to stand, it will send a clear signal to Lang and all other employers performing Davis-

_____

[27] In a similar context, this Court has denied application of agency regulations where an unjust penalty is worked to an employer.  In Thompson v. Diocese of Saginaw, 2004 WL 45519 (ED Mich, 2004), Judge Lawson found the categorical penalty set forth in 29 C.F.R. 825.700(a) notice provisions to be contrary to the express purposes of the Family and Medical Leave Act and, thus, refused to enforce them against the employer.

Bacon work that they are better off *not* trying to timely remedy apparent deficiencies in prevailing wage obligations as they arise but, rather, should wait until the conclusion of a contested case proceeding to ensure credit for payments specifically designed to meet such obligations.

Finally, the Board's ruling that Lang must pay twice because the pay was not itemized on the pay stubs or otherwise referred to as "vacation" pay is contrary to the Administrator's handling of other similar credit.  The Administrator credited Lang for holiday pay given by Lang to its employees because it seemed "the fairest thing to do."  (Bliek, p. 506; Lang, pp. 702-704; Resp Exbs 28, p. 1600, 29, p. 1601) even though that particular fringe benefit was not specifically itemized on pay stubs as "holiday pay" (Lang, pp. 704-707; Resp Exbs 30, p. 1602, 31, p. 1603).  Thus, there is no logical or legal reason for the Administrator to treat these payments differently for purposes of bona fide fringe benefit credit on the Kent County Airport project.  If it was proper to do for holiday pay, it is proper to do for vacation pay.

> **E.     LANG PROPERLY MET ALL PREVAILING WAGE AND FRINGE BENEFIT OBLIGATIONS TO THOSE EMPLOYEES WORKING ON THE PROJECTS AT ISSUE, INCLUDING THOSE EMPLOYEES WHO WORKED AS LABORERS.  THE BOARD APPEARS TO HAVE BYPASSED THIS ISSUE.**

The Administrator claimed before the ALJ that some employees who worked as laborers on the Kent County Airport project, DBA-3, did not receive any fringe benefits.  The extent of the evidence on this issue is found in Ms. Bliek's testimony.  She testified that "a group of employees" worked as laborers on the project, that Lang paid the proper wage rate, but Lang failed to provide fringe benefits other than health insurance (Bliek, pp. 514-516).  There was no first-hand testimony from employees on the matter despite the Administrator having called

several employees as witnesses in this case, other than a scant mention from one employee who stated that he cut some trees down with a chain saw on the Kent County Airport project and that he noted this on his time card (Cameron, p. 124).  Accordingly, Lang submits there is not sufficient evidence on the record to demonstrate that Lang has committed any violation of the Act with respect to employment of laborers on the Kent County project.  The Board did not appear to rule on this issue.

Lang submits that it has provided sufficient payment to its equipment operators performing work as laborers on the DBA-3 project in any event.  The Administrator claims the fringe benefits owed equal $5.16 per hour.  Assuming this is true, Lang need only show that it paid the equivalent of $5.16 per hour in fringe benefits to its employees on the job in addition to the wage rate found in the wage determination which the Administrator has conceded Lang properly paid.  The evidence shows, and Judge Roketenetz agreed, that Lang has met and exceeded the $5.16 amount allegedly required. [28]  Ultimately, all employees received various fringe benefits valued well in excess of $5.16 per hour, regardless of whether the employees worked as operators or laborers.

---

[28]First, Lang has always provided meals and lodging expense reimbursement to its equipment operators regardless of whether they were performing operator work or laborer work.  Thus, the hourly credit the company has taken with respect to hours worked by employees as operators should also apply to any hours worked by the employees as laborers.  Since, for the Kent County project, the meals and lodging amounts were no less than $4.29 per hour and as much as $5.32 per hour (Resp Exb 37, p. 1608), the lion's share of any fringe benefit requirement would have been met through Lang's meals and lodging policy.  Assuming a possible deficit of $0.87 ($5.16 - $4.29 = 0.87), this amount is more than covered by other fringe benefits.  For example, the parties stipulated that retirement benefits would be paid in this case.  Thus, Lang is entitled to take a "per hour credit" for those payments equaling $2.11 per hour, regardless of whether the employee was working as an operator or a laborer (Resp Exb 37; Adm Exb 3a).  Likewise, the health insurance credits, whether under Lang's formula found proper by the Judge or Ms. Bliek's confusing formula, should be more than enough to cover any possible deficit.  Vacation credit of $2.46 per hour erroneously denied by the Judge could also be used to offset any amount owed under any possible Davis-Bacon obligation.

## **CONCLUSION**

For the reasons explained in this brief, Petitioner, Lang Land Clearing, respectfully requests that this Honorable Court reverse the rulings of the Administrative Review Board and issue an order in accordance with Lang's positions and calculations in this case.

Dated:  July 18, 2005                      /s/ KRAIG M. SCHUTTER
                                            4449 Fashion Square Boulevard
                                            Saginaw, Michigan  48603
                                            (989) 792-4499
                                            kschutter@mpslaborlawyers.com
                                            P45339

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that July 18, 2005, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system and I hereby certify that I have mailed by United States

Postal Service the paper to Charles Binder, U.S. District Judge, United States District Court,

Eastern District of Michigan, 323 Post Office Building, Bay City, Michigan  48708, and the

following individuals:

<u>**Via United States Mail**</u>:

Honorable Daniel J. Roketenetz
Administrative Law Judge
Office of Administrative Law Judges
525 Vine Street, Suite 900
Cincinnati, OH  45202

Howard Radzely
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave., N.W.
Room S-2002
Washington, D.C.  20210

Raymond Bingaman, Jr.
President
Peters Construction Company
3325 East Kilgore Road
Kalamazoo, MI  49512

Carol Arnold
Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Room N-2716
Washington, D.C.  20210

Richard J. Fiore, Esq.
Regional Solicitor
Office of the Solicitor
U.S. Department of Labor
Federal Bldg., 8th Floor
230 S. Dearborn St.
Chicago, IL  60604

Terry R. Yellig, Esq.
Sherman Dunn Cohen Leifer & Yellig
1125 15th St., N.W.
Suite 801
Washington, D.C.  20005

William A. Isokait, Counsel
Labor & Employment Law
Associated General Contractors of America
333 John Carlyle St., Suite 200
Alexandria, VA  22314

Robert P. Casey, Esq.
Murphy Smith & Polk
Twenty-fourth Floor
Two First National Plaza
Chicago, IL  60603

National Infrastructure Alliance
1750 New York Ave., N.W.
Suite 240
Washington, D.C.  20006

Daniel L. Zito
Vice-President
Zito Construction Company
G-8033 Fenton Road
Grand Blanc, MI  48439

Richard Steigenga
President
Kamminga & Roodvoets, Inc.
3435 Broadmore Avenue, S.E.
Grand Rapids, MI  49512

Michael Donohoe
Vice-President
John Carlo, Inc.
21570 Hall Road
P.O. Box 8
Mount Clemens, MI  48046

Mark D. Sassak
Schier Deneweth & Parfitt
888 West Big Beaver Road
Suite 610
Troy, MI  48084-4737

Virgil Klebba, Jr.
Dan's Excavating, Inc.
12955 23 Mile Road
Shelby Township, MI  48315

Alexander Marketos
The Fishman Group
2050 North Woodward Ave.
Suite 350
Bloomfield Hills, MI  48304-2260

Honorable John Vittone
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K. Street, N.W., Suite 400
Washington, D.C. 20001-8002

Ronald A. Deneweth, Esq.
Schier Deneweth & Parfitt
888 West Big Beaver Road
Suite 610
Troy, MI  48084-4737

Donald H. Scharg, Esq.
The Fishman Group
2050 N. Woodward Ave.
Suite 350
Bloomfield Hills, MI  48304-2260

Alfred B. Robinson
Acting Administrator
ESA/Wage & Hour Division
Room S-3502
200 Constitution Avenue, N.W.
Washington, D.C.  20210

Administrator
Administrative Review Board
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C.  20210

Jeffrey G. Collins
U.S. Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226

John Ashcroft
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

Dated:  July 18, 2005                    /s/ KRAIG M. SCHUTTER
                                         4449 Fashion Square Boulevard
                                         Saginaw, Michigan  48603
                                         (989) 792-4499
                                         kschutter@mpslaborlawyers.com
                                         P45339