UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM J. LANG LAND CLEARING, INC.,

      Petitioner,      Civil Case Number 04-10336
v.                Honorable David M. Lawson
                  Magistrate Judge Charles E. Binder
ADMINISTRATOR, WAGE AND HOUR
DIVISION, U.S. DEPARTMENT OF LABOR,
and ADMINISTRATIVE REVIEW BOARD,
U.S. DEPARTMENT OF LABOR,

      Respondents.
_____/

**OPINION AND ORDER SUSTAINING IN PART AND OVERRULING
IN PART OBJECTIONS TO MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION, ADOPTING RECOMMENDATION IN
PART AND REJECTING IN PART, GRANTING RESPONDENTS' MOTION
FOR SUMMARY JUDGMENT, AND DENYING
PETITIONER'S MOTION FOR SUMMARY JUDGMENT**

Several Acts of Congress, most notably the Davis-Bacon Act, require that employers on federal projects pay employees a minimum wage equal to "the wages the Secretary of Labor determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed." 40 U.S.C. § 3142(b) (formerly cited as 40 U.S.C. § 276a). Under the Act and corresponding Department of Labor regulations, the compensation paid to workers is calculated by adding to the periodic wage payments credits for certain qualifying fringe benefits; the total must meet or exceed the "minimum wage" under the Act. The petitioner in this case, William J. Lang Land Clearing, Inc., performed work under several government contracts subject to the Act's minimum wage requirements. The petitioner filed an action in this Court under the Administrative Procedures Act challenging determinations by the Department of Labor's Wage and Hour Division

disallowing credit for fringe benefits in three categories claimed by the petitioner against the minimum wage requirement; and a separate determination that certain workers were classified by the petitioner improperly in a lower prevailing wage category. The parties filed cross motions for summary judgment, which were referred to Magistrate Judge Charles E. Binder for a report and recommendation under 28 U.S.C. § 636(b)(1)(B). Judge Binder filed his report on March 28, 2006 recommending that the respondents' motion for summary judgment be granted in part and the Wage and Hour Division Administrator's decision be sustained as to disallowing credit against the minimum wage for non-qualifying fringe benefits. Judge Binder also recommended that the petitioner's motion be granted in part and the Administrative Review Board's (the Board) decision reversed as to the classification of workers. Both sides filed timely objections and the matter is before the Court for a *de novo* review of the matter presented. However, a court's review of an agency determination under the Administrative Procedures Act is highly deferential, and the Court now finds that the Board's decision in each of the four areas of challenge is supported by substantial evidence, and it is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore, the Court will overrule the petitioner's objections to the report and recommendation, sustain the respondents' objection, grant the respondent's motion for summary judgment, deny the petitioner's motion for summary judgment, and affirm the Board's decision.

## I.

The dispute in this case focuses on the Board's decision of four issues that underlie its determination that William J. Lang Land Clearing, Inc. (Lang, Inc.) did not pay minimum wage to its workers performing certain contracts as required by the Davis-Bacon Act, 40 U.S.C. § 3141-3148, and other related acts, including the Federal Aid Highway Act, 23 U.S.C. § 101, the Airport

and Airway Improvement Act, 49 U.S.C. § 47112(b), Reorganization Plan No. 14 of 1950, 5 U.S.C. App., the Contract Work Hours and Safety Standards Act, 40 U.S.C. § 3701-3708, and the related regulations under 19 C.F.R. Part 5. The Administrator found that in calculating the wages it reported as having been paid to its workers, Lang, Inc. (1) took improper credit for meals and lodging provided to employees; (2) improperly used an annual across-the-board average of its health insurance premium payments to compute hourly fringe benefit credit; (3) improperly took prevailing wage credit for vacation payouts; and (4) misclassified power equipment operators to a lower paid group classification (Class IV instead of Class I, where the Administrator said they belonged).

The magistrate judge's report contains a brief factual summary, which the Court believes should be expanded to address the cross motions for summary judgment. Lang, Inc. is a construction contractor located in Beaverton, Michigan that performs land clearing work. The petitioner originally cleared mostly farmland and forests, primarily using bulldozers to clear the land. The petitioner categorized the bulldozer operators as Class I employees under the applicable wage determinations, which includes employees who use heavy earth-moving, highway construction, and paving equipment. The petitioner recently has focused more on clearing land around roads and highways. It uses different equipment for this work, including a recycler or "tub grinder," hydro-axes, skidders (used to drag bundles of trees to a chipper), chippers, and wheel grinders. The Board's opinion describes the various pieces of equipment in Lang, Inc.'s arsenal:

> The hydro-ax is similar to an end loader and is a relatively large piece of equipment; it is 10 feet tall and approximately 20 feet long.. Hydro-axes are used to cut down trees up to 20 inches in diameter and can also clear underbrush. Skidders also measure approximately 10 feet tall and 20 feet long. This type of equipment is used with a grappling attachment to pick up and transport trees that are cut by the hydro-axes. . . . The tree chipper is used to process felled trees (and brush) into wood chips; it is 30 to 40 feet long, 15 to 16 feet high, and is capable of reducing a 20-inch diameter tree to wood chips in less than one minute. The final piece of disputed

equipment is the stump grinder, used to grind away the tree stumps which remain after the trees have been removed by the hydro-ax. The stump grinder, a modified excavator or backhoe, weights 70 to 80 thousand pounds and in less than two minutes can grind a stump up to 22 inches in diameter.

A.R. at 2005, Board's Final Decision and Order. The parties also used a "bulldozer in at least some capacity" on one project. A.R. at 1729, ALJ Decision and Order. The petitioner still keeps a few bulldozers as backup for other equipment or to retrieve equipment that gets stuck. The petitioner classifies all its operators as Class IV operators, which includes users of miscellaneous equipment such as farm, trucking, and forestry equipment.

The petitioner has worked as a subcontractor for five different prime contractors on six contracts that received federal funds. The cases under review involve the following work:

in Case No. 98-DBA-1 as a subcontractor under Peters Construction Company on a Michigan Department of Transportation (MDOT) new construction project in Kalamazoo County during mid-1996.

in Case No. 98-DBA-2 as a subcontractor under Zito Construction on a MDOT road-widening project in Genesse County during late 1996.

in Case No. 98-DBA-3 as a subcontractor under Kamminga and Roodvooets, Inc., on a MDOT road-extension project in Kent County from May 1995 through October 1996.

in Case No. 98-DBA-4 as a subcontractor under John Carlo, Inc. on a MDOT road construction project in Macomb County from June 1990 through August 1996.

in Case No. 98-DBA-5 as a subcontractor under John Carlo, Inc. on a MDOT road construction project in Macomb County from August 1996 through May 1998.

in Case No. 98-DBA-6 as a subcontractor under Dan's Excavating, Inc., MDOT pavement reconstruction project in Oakland County from July 1996 through July 1998.

A.R. at 1725-26, ALJ Decision and Order.

Over the course of two years, the petitioner employed twenty-two employees on these six contracts. Class I employees were to receive between $17.85 and $21.13 per hour, with benefits valued between $8.15 and $10.28 per hour. Class IV were paid between $14.79 and $17.50 per hour, with fringe benefits valued between $8.15 and $9.89 per hour.

The petitioner also provided meals and lodging to its employees while they were working on federal projects. In addition, the petitioner provided health insurance to its employees and credited the cost towards its wage obligations. In 1995, it claimed a credit for $1.65 per hour per employee, which was increased to $1.91 in 1996. On July 13, 1995, August 3, 1995, and December 29, 1995, the petitioner made extra payments to its employees, the nature of which was vigorously disputed at the administrative hearing. The petitioner claimed a credit for all these payments as qualifying fringe benefits that were added to the actual wages to measure against the minimum wage required by the Davis-Bacon Act and other federal laws and rules.

In 1996, the United States Department of Labor, Wage and Hour Division (referred to by the parties as the Administrator) investigated the petitioner's practices regarding their obligation to pay prevailing wages under the relevant federal requirements. The investigation began after the Department of Labor received a complaint from some anonymous employees. As a result of its investigation, the respondent began proceedings against the petitioner. On May 18 through 20, 1999, a hearing was held before ALJ Daniel Roketenetz in Midland, Michigan. Several current and former employees of the petitioner testified as this hearing. The ALJ found that Lang, Inc. wrongfully had taken fringe benefit credit for bonus payments that it had improperly characterized as vacation payments. But he also found that Lang, Inc. did not classify its equipment operators as Class IV instead of I improperly; it was entitled to credit for reimbursement for meals and

lodging; and it could average his health insurance costs for the purposes of determining the amount of the credit against the minimum wage.

Both parties appealed to the Administrative Review Board. The Board issued its decision on September 28, 2004, reversing the ALJ's rulings in favor of the petitioner and affirming the ruling in favor of the Administrator. The Board rejected the ALJ's conclusion that Lang, Inc. could take credit for the meals and lodging it provided its employees. Additionally, the Board reversed the ALJ's determination that Lang's health insurance credit calculation was proper. Finally, the Board turned to the dispute regarding the classification of equipment operators and found that the local practice of classifying workers followed categories found in certain collective bargaining agreements, and the prevailing wages must track those classifications. The Board found that the witnesses for the government had presented "copious, uniform, and unrebutted testimony" that Lang's equipment operators should be classified in Group I, and the ALJ erred by holding otherwise. A.R. at 2027-28.

On December 3, 2004, the petitioner filed the present action seeking review of these decisions. Cross motions for summary judgment were filed on July 18, 2005 and referred to the magistrate judge. On March 28, 2006, Magistrate Judge Binder issued his report and recommendation agreeing with the petitioner on the equipment (worker) classification issues and the respondent on the other three issues. Both parties filed timely objections.

II.

Objections to a report and recommendation are reviewed *de novo*. 28 U.S.C. § 636(b)(1). The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement." *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006). "The objections must be

clear enough to enable the district court to discern those issues that are dispositive and contentious."
*Miller v. Currie,* 50 F.3d 373, 380 (6th Cir.1995). "'[O]bjections disput[ing] the correctness of the
magistrate's recommendation but fail[ing] to specify the findings . . . believed [to be] in error' are
too general." *Spencer*, 449 F.3d at 725 (quoting *Miller*, 50 F.3d at 380).

Review of actions by an administrative agency is generally conducted under the
Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* According to section 706 of the Act, a
federal court must "hold unlawful and set aside agency action, findings and conclusions found to
be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."
5 U.S.C. 706(2)(A); *L.P. Cavett Co. v. U.S. Dept. of Labor*, 101 F.3d 1111, 1113 (6th Cir. 1996).
The magistrate judge suggested that when the Administrative Review Board disagrees with the ALJ,
a less deferential standard of review applies. R&R at 4 (citing *Miree Constr. Corp. v. Dole*, 930
F.2d 1536, 1541 (11th Cir. 1991). However, as the Sixth Circuit has explained:

> We may disturb the Secretary of Labor's decision "only if we find that the decision
> 'is unsupported by substantial evidence' or if it is 'arbitrary, capricious, an abuse of
> discretion, or otherwise not in accordance with law.'" *Varnadore v. Secretary of
> Labor*, 141 F.3d 625, 630 (6th Cir. 1998) (quoting the Administrative Procedure Act
> at 5 U.S.C. 706(2)(A)). The ARB acts for the Secretary of Labor and is responsible
> for issuing "final agency decisions." *Id.* at 630. To satisfy the substantial evidence
> standard, the Board's decisions must be supported by "such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion." *ITT Auto v.
> NLRB*, 188 F.3d 375, 384 (6th Cir. 1999). "The substantial evidence standard is a
> lower standard than weight of the evidence and 'the possibility of drawing two
> inconsistent conclusions from the evidence does not prevent an administrative
> agency's finding from being supported by substantial evidence.'" *Painting Co. v.
> NLRB*, 298 F.3d 492, 499 (6th Cir. 2002) (quoting *NLRB v. Kentucky May Coal Co.
> Inc.*, 89 F.3d 1235, 1241 (6th Cir. 1996)). "***This highly deferential standard of
> review is not altered merely because the Secretary disagrees with the ALJ***, *see
> Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951), and we 'defer to the
> inferences that the Secretary derives from the evidence, not to those of the ALJ.'"
> *Varnadore*, 141 F.3d at 630 (quoting *Lockert v. United States Dep't of Labor*, 867
> F.2d 513, 519 n.2 (9th Cir. 1989)).

*Sasse v. United States Dep't of Labor*, 409 F.3d 773, 778-79 (6th Cir. 2005) (emphasis added).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Nonetheless, the agency must articulate a "rational connection between the facts found and the choice made." *Id*. (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). An abuse of discretion is found when, based on the evidence, the explanation offered for a particular outcome is unreasonable. *Perry v. United Food & Commercial Workers Dist. Unions 405 and 442*, 64 F.3d 238, 242 (6th Cir. 1995).

An agency ruling that is contrary to law likewise must be set aside. A court may invalidate an agency adjudication or rule making if it is "inconsistent with the statutory mandate or frustrate[s] the policy that Congress sought to implement." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1350 (6th Cir. 1994). "An agency which violates its regulations is acting contrary to law." *Chrysler Corp., v. Schlesinger*, 412 F. Supp. 171, 177 (D. Del. 1976), *vacated on other grounds sub nom Chrysler Corp. v. Brown*, 441 U.S. 281 (1979); *S.&S. Logging Co. v. Barker*, 366 F.2d 617, 624 n.6 (9th Cir. 1966); *Delaware v. Bender*, 370 F. Supp. 1193, 1203 (D. Del. 1974).

The Davis-Bacon Act requires employers on federal projects to pay employees the prevailing wage in a community. The twin purposes of the act are to "give local laborers and contractors fair opportunity to participate in building programs when federal money is involved and to protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area." *L.P. Cavett*, 101 F.3d at 1113. The Davis-Bacon Act is a "remedial act for the benefit of construction workers, . . . and is therefore liberally construed to effectuate its

beneficent purpose." *Drivers, Local Union No. 695 v. NLRB*, 361 F.2d 547, 553 n. 23 (D.C. Cir. 1966) (citing *United States v. Binghamton Construction Co.*, 347 U.S. 171, 176-178 (1954)).

To determine the applicable wage, the Davis-Bacon Act allows "the basic hourly rate of pay" to be added to the value of certain fringe benefits, calculated as:

> the rate of contribution irrevocably made by a contractor or subcontractor to a trustee or to a third person pursuant to a fund, plan, or program; and

> the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to laborers and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the laborers and mechanics affected . . . for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, for unemployment benefits, life insurance, disability and sickness insurance, or accident insurance, for vacation and holiday pay, for defraying costs of apprenticeship or other similar programs, or for other bona fide fringe benefits, but only where the contractor or subcontractor is not required by other Federal, State, or local law to provide any of such benefits[.]

40 U.S.C. § 276a (2000). This language was rearranged but not modified in 2002 (except the last line replaced "any of *such* benefits" with "any of *those* benefits"). *Compare* 40 U.S.C. § 3141(2) *with* 40 U.S.C. § 276a(b) (2000). In 2002, there was a deletion of the provision (although it is still applicable to this case):

> Provided, That the obligation of a contractor or subcontractor to make payment in accordance with the prevailing wage determinations of the Secretary of Labor, insofar as sections 276a to 276a-5 of this title and other Acts incorporating sections 276a to 276a-5 of this title by reference are concerned may be discharged by the making of payments in cash, by the making of contributions of a type referred to in paragraph (2)(A), or by the assumption of an enforceable commitment to bear the costs of a plan or program of a type referred to in paragraph (2)(B), or any combination thereof, where the aggregate of any such payments, contributions, and costs is not less than the rate of pay described in paragraph (1) plus the amount referred to in paragraph (2).

*Compare* 40 U.S.C. § 3141(2) *with* 40 U.S.C. § 276a(b) (2000).

As mentioned, there are four areas of dispute presented by the petitioner's complaint, the magistrate judge's report, and the parties' objections. The Court will address each in turn.

## A. Meals and Lodging

The magistrate judge concluded that the Board's decision should stand that Lang's provision of food and lodging at the work site do not count as a fringe benefit. The petitioner objected and insists that its payments were bona fide fringe benefits under a commitment to carry out a responsible plan or program, or alternatively as a payment of cash toward the hourly rate. It argues that the payments provide a real benefit to the employees, and are not a sham; therefore they are bona fide and should be allowed. Alternately, the petitioner argues that the Fair Labor Standards Act (FLSA) permits it to count as "wages" the reasonable cost of meals and lodging, and it met all record-keeping requirements of that Act. The petitioner also contends that a like practice was approved in *Soler v. G & U, Inc.*, 833 F.3d 1104 (2nd Cir. 1987). Finally, it asserts that the Administrator's ruling will result in an increased tax burden for employees if living expenses away from home are compensated in an increase in taxable wages rather than reimbursement.

"[I]n order for board and lodging reimbursement to be creditable toward the employer's obligations under the Davis-Bacon Act, such subsistence payments must be determined to be either part of the basic rate of pay or a bona fide fringe benefit." *In re Calculus, Inc.*, 1993 WL 537381 (Wage Appeal Board, October 29, 1993). The regulations discuss the meaning of "other bona fide fringe benefits":

> (c) The term "other bona fide fringe benefits" is the so-called "open end" provision. This was included so that new fringe benefits may be recognized by the Secretary as they become prevailing. It was pointed out that a particular fringe benefit need not

be recognized beyond a particular area in order for the Secretary to find that it is prevailing in that area. (S. Rep. No. 963, p. 6).

(d) The legislative reports indicate that, to insure against considering and giving credit to any and all fringe benefits, some of which might be illusory or not genuine, the qualification was included that such fringe benefits must be "bona fide" (H. Rep. No. 308, p. 4; S. Rep. No. 963, p. 6). No difficulty is anticipated in determining whether a particular fringe benefit is "bona fide" in the ordinary case where the benefits are those common in the construction industry and which are established under a usual fund, plan, or program. This would be typically the case of those fringe benefits listed in paragraph (a) of this section which are funded under a trust or insurance program. Contractors may take credit for contributions made under such conventional plans without requesting the approval of the Secretary of Labor under § 5.5(a)(1)(iv).

(e) Where the plan is not of the conventional type described in the preceding paragraph, it will be necessary for the Secretary to examine the facts and circumstances to determine whether they are "bona fide" in accordance with requirements of the act. This is particularly true with respect to unfunded plans. Contractors or subcontractors seeking credit under the act for costs incurred for such plans must request specific permission from the Secretary under § 5.5(a)(1)(iv).

. . .

(f) . . . While each situation must be separately considered on its own merits, payments made for travel, subsistence or to industry promotion funds are not normally payments for fringe benefits under the Act. The omission in the Act of any express reference to these payments, which are common in the construction industry, suggests that these payments should not normally be regarded as bona fide fringe benefits under the Act.

29 C.F.R § 5.29 (1999).

Another regulation permits an employer to deduct as credit towards "wage":

(j) Any deduction not more than for the "reasonable cost" of board, lodging, or other facilities meeting the requirements of section 3(m) of the Fair Labor Standards Act of 1938, as amended, and Part 531 of this title. When such a deduction is made the additional records required under § 516.25(a) of this title shall be kept.

29 C.F.R. § 3.5 (1999). This regulation was promulgated "to aid in the enforcement of the minimum wage provisions of the Davis-Bacon Act." 29 C.F.R. § 3.1 (1999). The regulation expressly incorporates section 3(m) of the FLSA, and its interpreting regulations.

Section 3(m) of the FLSA states that:

"Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees

29 U.S.C. § 203(m) (1994). "Customarily furnished," in turn, is defined in the regulations as "furnished regularly by the employer to his employees or if the same or similar facilities are customarily furnished by other employees engaged in the same or similar trade, business, or occupation in the same or similar communities." 29 C.F.R. § 531.31 (1995). However, reimbursement for expenses incurred primarily for the benefit of the employer are not credited to the employee's wages under this section. 29 C.F.R. § 778.217(a). The regulation offers as an example of a reimbursement not credited to the employee: "The actual or reasonably approximate amount expended by an employee, who is traveling 'over the road' on his employer's business, for transportation (whether by private car or common carrier) and living expenses away from home, other travel expenses, such as taxicab fares, incurred while traveling on the employer's business." 29 C.F.R. § 778.217(b)(3) (1995).

The agency promulgated a Field Office Handbook, that, given the agency's expertise, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which the courts and litigants may properly resort for guidance." *Reich v. Miss Paula's Day Care Center, Inc.*, 37 F.3d 1191, 1194 (6th Cir. 1994) (quoting *Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 182 (1946) and citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Battle Creek Health System v. Leavitt*, --- F.3d ----, 2007 WL 2301506, at *11 (6th Cir. August 14, 2007) (looking to agency's Medicare manual for guidance). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those

factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

The Handbook notes that, under FLSA:

> The crediting by an employer of facilities furnished to employees as wages will depend on whether such facilities are furnished primarily for the benefit or convenience of the employee, as determined by WH. Where the primary benefit of such facilities is to the employer's business interest, credit will be denied. The following are commonly viewed as furnished primarily for the benefit or convenience of employees:
> (1) <u>Meals</u>
> Meals furnished by the employer are regarded as primarily for the benefit and convenience of the employees. This rule does not apply, however, to the meal expenses incurred by an employee while traveling away from home on the employer's business.
> (2) <u>Lodging</u>
> Lodging, like meals, is ordinarily considered for the benefit and convenience of the employee. Circumstances may exist, however, where housing is of little benefit to employees, as where . . . the employee must travel away from home to further the employer's business. In such circumstances, the housing will be considered as primarily benefiting [sic] the employer.

Field Operations Handbook § 30c03 (6/29/1990), *available at* http://www.dol.gov/esa/whd/FOH/FOH_Ch30.pdf.

Case law interpreting this section provides insight into when room and board qualifies as benefitting the employer or employee. One factor that is not relevant for determining whether meals or lodging count towards the wage is whether the employees are given a choice whether to accept the benefit. *Herman v. Collis Foods, Inc.*, 176 F.3d 912, 917-18 (6th Cir. 1999) (meals); *Donovan v. Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983) (per curiam) (lodging).

The Administrative Review Board's predecessor, the Wage Appeals Board, determined that an employer could not credit $50 per day per diem payments designated towards their prevailing wage requirements. *Calculus, Inc.*, WAB Case No. 93-06, 1993 WL 537381 (1993). The Board decided that "subsistence payments are not wages, are not considered to be bonafide fringe benefits,

and do not constitute permissible deductions from employees' wages." *Id.* at *2 (citing Handbook § 15f18). The Board based this conclusion on several grounds: that the employer did not keep any records of the payments; the payments were not customarily furnished except for that particular contract; and evidence was wanting that the payments primarily benefitted the employee. *Id.* at *3-4.

The determination of whether the employer or employee benefits requires a case-by-case inquiry. Without benefit of a Department of Labor ruling in the case, the Fifth Circuit found that a per diem payment to an employee was for the benefit of the employer, and so should not be included in his wage for the purposes of calculating overtime compensation. *Berry v. Excel Group, Inc.*, 288 F.3d 252, 254 (5th Cir. 2002) (noting that meals and lodging for out-of-town work "were in addition to his regular recurring household expenses in Brookewood where his family lived and where he maintained his primary residence").

In contrast, the Second Circuit found that housing facilities for migrant workers were for the benefit of the employee, and therefore should be counted towards their wages under the FLSA. *Soler v. G. & U.*, Inc., 833 F.2d 1104 (2nd Cir. 1987). Against a challenge under the APA, the court found the Board's decision was not arbitrary and capricious. The court introduced the idea that there is a presumption that lodging is provided for the benefit of the employee, particular when the workers had no other residences and the cost of on-site housing was found reasonable.

The agency handbook says that, under the Davis-Bacon Act:

Where an employer sends empoyees [sic] who are regularly employed in their home community away from home to perform a special job at a location outside daily commuting distances from their homes so that, as a practical matter, they can return to their homes only on weekends, the assumption by the employer of the cost of the board and lodging at the distant location, not customarily furnished the empoyees [sic] in their regular employment by the employer, and of weekend transportation

costs of returning to their homes and reporting again to the special job at the end of the weekend, are considered as payment of travel expenses properly reimbursable by the employer and incurred for its benefit. Such payments are not considered bona fide fringe benefits within the meaning of the DBRA, are not part of the empoyees' [sic] wages, and do not constitute board, lodging, or other facilities customarily furnished which are deducible from the predetermined wage pursuant to Regs 3.5(j).

Field Operations Handbook § 15f18 (6/29/1990), *available at* http://www.dol.gov/esa/whd/ FOH/FOH_Ch15.pdf.

At the administrative hearing, it was established that Lang, Inc. provided meals and lodging to its employees while they were working on federal projects. The petitioner's projects were scattered throughout Michigan, often far away from the company's headquarters in Beaverton. The petitioner decided to require the employees to stay in a motel chosen by the petitioner during the work week and not permit them to return home until the weekend. The employees were given a company credit card and permitted to charge these expenses or seek reimbursement. The petitioner chose to do this rather than increase the pay for its employees while they were working out of town.

Employees testified that, had Lang not reimbursed them for these expenses, they would have quit. A.R. at 156, Hr'g Tr., May 18, 1999 (testimony of Kurt Cameron). The government also introduced testimony that the industry custom is to not take fringe benefit credit for meal and lodging reimbursement. Ken Swartz is a regional manager for Walsh Construction Company, which performs shrub-clearing and site-clearing services. He testified that his company covers its employees' meals and lodging but does not claim a fringe benefit credit for this. He reasoned that his company was the one that "primarily" benefitted from the payment because it is cheaper to keep the same employees and pay their travel than to pay to retrain. He believes that his company's practice was consistent with general industry practices. Craig Sickmiller, of Sunset Excavating

testified that when his company pays for meals and lodging for workers away from home, it is done primarily for the benefit of the company.

The Board rejected the ALJ's conclusion that Lang could take credit for the meals and lodging it provided its employees. The Board noted that the statute and interpreting regulations expressly exclude such payments in most situations. The Administrator's Handbook is not to the contrary, the Board held, because the handbook's exclusion of payments for "special jobs" includes jobs that are "outside a commuting zone which would allow employees to return home nightly after each day's work shift." A.R. at 2012-13. Moreover, "[t]he employee lodging and food expenses in this case were clearly undertaken for Lang's benefit. Lang could only perform its far distant [Davis-Bacon Act] contracts (and benefit thereby) if its employees incurred the substantial detriment of traveling to locals far from their homes for most of every work week." *Id.* at 2014-15. The Board also pointed to the 1993 Board decision in *Calculus, Inc.*, which did not permit the employer to claim a credit for food and lodging when the employees were required to be away from home during the week.

The Court believes that this is a reasonable application of the law to the facts developed below. It also appears to be consistent with the prevailing practice of Michigan contractors. *See* A.R. at 470, Hr'g Tr., May 19, 1999 (testimony of Sickmiller). The petitioner has cited no case, either by a court or the Board, that compels a contrary finding. The cases the petitioner relies upon provide, at best, isolated suggestions in dicta or an inference that might support it, yet are easily distinguishable on their facts from the present case. The decision also is consistent with the agency's handbook, a longstanding document informed by the agency's expertise. The Court finds that Administrator's ruling is not arbitrary, capricious, or contrary to law, and it is supported by

substantial evidence in the record. The petitioner's objection will be overruled and the Administrator's decision affirmed.

## B. Health Insurance

The petitioner next objects to the magistrate judge's conclusion that the Board's decision denying credit for health insurance payments should stand. The administrative record shows that the petitioner provided health insurance to its employees and credited the cost towards its wage obligations. In 1995, it claimed a credit for $1.65 per hour per employee, which was increased to $1.91 in 1996. A.R. at 50-51, Hr'g Tr., May 18, 1999. The health insurance was available for the employee and the worker's family and continued during seasonal lay-offs, but became effective only ninety days after the employee's hiring. The petitioner calculated the credit amount by taking the total annual health insurance cost from the previous year for each job classification and dividing it by the number of hours worked by an employee in each classification that year to come to a cost per hour for each classification. John Hamilton testified on behalf of the local union before the ALJ that the bargaining agreement between his union and contractors sets an hourly amount for health insurance. *Id.* at 265, Hr'g Tr., May 19, 1999. The hourly rate is the same whether the employee has dependents or not.

The ALJ found in favor of Lang, Inc., but the Board reversed. It held that because the company pays more for employees that receive family insurance, averaging the credits between employees with and without additional insureds is improper because "Lang failed to pay its single-insured employees their required DBA prevailing wage because the average wage overstated the cash value of their insurance benefit." *Id.* at 2017-18. The Board also found that Lang's inclusion of employees who were not yet eligible for the insurance during their first ninety days was improper,

because "[e]mployees who are excluded from a plan for whatever reason and for whom the employer makes no contribution must be paid in cash." *Id.* at 2019 (quoting Handbook Section 15f12 (emphasis omitted)).

The petitioner argues that there are extreme fluxuations from month to month in the value of the insurance benefit employees received per hour, but the value of the insurance to the employee remained constant. The petitioner defends its method of annualizing the benefit by pointing to an Eleventh Circuit decision affirming a decision of the Wage Appeals Board, which approved an employer's calculation of payments to an apprenticeship program fringe benefit on an annual basis. *Miree Construction Corp. v. Dole*, 930 F.2d 1536 (11th Cir. 1991)). The petitioner notes that it is allowed to average expenses spent on other fringe benefits – such as food and lodging when permitted – among all employees, despite varying costs between them, referring to *Herman v. Collis Foods*, 176 F.3d 912, 917-18 (6th Cir. 1999), a Sixth Circuit case that permitted an employee to average the cost of meals from all employees regardless of whether the employee actually took the meals or not for the purposes of determining wages under FLSA. The petitioner also cites the Handbook, which states "it is not required that all employees participating in the bona fide fringe benefit plan be entitled to receive benefits from that plan at all times." Pet'r.'s Obj. at 28 (citing Handbook § 15f12). Finally, it argues that its practice is the same as the practice of many contractors and the provisions of applicable collective bargaining contracts. *Id.* at 28-30 (citing A.R. 265-67 (testimony of Hamilton); A.R. 1554, Agreement between the Labor Relations Division of the Michigan Road Builders Association and the International Union of Operating Engineers, Local 324 (June 1, 1998) (permitting the credit of four dollars per hour for health care)).

The Davis-Bacon expressly permits employers to include, when calculating an employee's wage:

> the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to laborers and mechanics pursuant to an enforcible [sic] commitment to carry out a financially responsible plan or program which was communicated in writing to the laborers and mechanics affected, for medical or hospital care . . . or insurance to provide any of the foregoing . . .

40 U.S.C. § 276a (1994).

The agency's handbook states that credit may not be taken during a waiting period before an employee is eligible to receive the benefit:

> Eligibility standards are permissible in an otherwise "bona fide" fringe benefit plan under DBRA. However, an employer must make payments or incur costs in the applicable specified amounts with respect to each individual laborer or mechanic performing covered contract work. Employees who are excluded from a plan for whatever reason and for whom the employer makes no contribution must be paid in cash. For example, many hospitalization plans require a waiting period of 30 days before the employee can participate in the plan. Since the employee normally makes no contribution for the employee during the waiting period, the employee must be paid the fringe benefit in cash or furnished other bona fide fringe benefits equal in monetary value. If the plan requires contributions to be made during the eligibility waiting period, credit may be taken for such contributions, since it is not required that all employees <u>participating</u> in a bona fide fringe benefit plan be entitled to receive benefits from that plan at all times. However, credit may not be taken for contributions for employees who by definition are <u>not eligible to participate</u>, such as employees who are excluded because of age or part-time employment.

Handbook § 15f12, *available at* http://www.dol.gov/esa/whd/FOH/FOH_Ch15.pdf

The handbook also instructs that the employer may not average benefits when the employer's contribution varies between employees:

> In computing cash equivalents, it should be kept in mind that under certain kinds of fringe benefit plans the rate of contribution for employees may vary. For example, under a hospitalization plan the employer often contributes at different rates for single and family plan members. In such situations, an employer cannot take an across the board average equivalent for all employees; rather, the cash equivalent can only be credited based on the rate of contributions for each individual employee.

*Id.* at § 15f11(d).

The statute and regulations are also silent as to what time period should be used in calculating the credit. However, the Handbook specifies that the credit should be calculated using the same period as the contribution:

> In determining cash equivalent credit for fringe benefit payments, the period of time to be used is the period covered by the contribution. For example, if an employer contributes to a hospitalization plan on a weekly basis, the total hours worked (DBRA covered and noncovered) each week by each employee should be divided into the contribution made by the employer on behalf of each employee to determine the hourly cash equivalent for which the employer is entitled to take credit for each employee. If contributions are made bi-weekly, cash equivalents would be computed bi-weekly. If contributions are made quarterly, cash equivalents would be computed quarterly, etc.

*Id.* at § 15f11(a).

The magistrate judge appears to have rested his affirmation of the Board solely on Lang Inc.'s failure to distinguish between single and family plan members. *See* Rep. and Rec. at 10 ("Since Lang did not distinguish between single and family plan members in its across-the-board computation, Lang failed to properly calculate its fringe benefit according to Agency policy."). The magistrate judge was correct, as far as he went. The handbook, although not controlling, expressly contemplates different amounts will be credited for different family or single-person health care premium costs. That is not inconsistent with the statute and the regulations. In fact, the regulations require that the employer certify "[t]hat each laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly." 29 C.F.R. § 5.5(ii)(B)(2) (1995). This language suggests a general policy that *each* employee receive the prevailing full wage.

The petitioner's reliance on *Herman* for a contrary proposition is misplaced. There, the Court rejected the agency's reliance on the handbook and held that an employer could average the cost of *meals* among all employees for the purposes of the FLSA. *Herman*, 176 F.3d at 920. In so doing, however, the Court relied on the express statutory grant in the FLSA that contemplates the determination of "the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated, or average value to groups of employees, or other appropriate measures of fair value." 29 U.S.C. § 203(m). This reasoning is inapplicable to the calculation of health care benefits under the Davis-Bacon Act, which contains no such language. *Herman* may support the petitioner's policy argument that it is illogical to require it to individually determine the health insurance costs. Yet there are grounds for treating health care premiums differently than meal reimbursement. For instance, tracking meal expenses is much more difficult than the less-varied health care premiums.

Moreover, the Board must be affirmed on its rejection of the petitioner's inclusion of the waiting period and method of calculating the hourly benefit. The petitioner does not dispute the meaning of the applicable passages of the Handbook, but instead argues that they should be ignored in its case. This argument fails, however, because the Board's reliance on the handbook is itself eminently reasonable.

The petitioner's reliance on *Miree Construction* to challenge the handbook's relevant provisions likewise is unpersuasive because the case does not support this contention. In *Miree Construction,* the Board and the Eleventh Circuit found that calculation of the fringe benefit – the cost of an apprenticeship program – should be annualized over all projects worked by the employer whether governed by the Davis-Bacon Act or not. The issue in dispute was whether the employer

had to include non-Davis-Bacon Act projects in its calculation of hours. The parties were not disputing the time period denominator. *Miree Const. Corp.*, 930 F.2d at 1546.

The petitioner's argument that agency-approved contracts permit the employer to average the costs among all employees (including between those with and without dependents, and those in an eligibility-waiting period) is without evidentiary support. Lang, Inc. cites to union president Hamilton's admission that the contractors pay the same hourly rate for all employees, and it points to the union contract calling for the payment of $4 for each employee on the contract. However, as the respondent argues, that practice is permissible *only if* the contractor pays the same amount regardless of the family coverage or whether the employee is currently receiving benefits. There is no evidence that the union's contract did not comply with this rule. On such a fact question, deference to the Board is particularly appropriate.

Finally, the petitioner advances a general policy argument that its method is dictated by "common sense" and is "sound, more equitable to all parties involved." Pet.'s Obj. at 23-24. That may be true, but this alternate rationale does not establish that the Board's decision is unreasonable. Policy considerations are better dealt with by the agency charged with administering the act.

The Court concludes that the objection on this ground must be overruled.

### C. Cash payments

The magistrate judge suggested affirmance of the Board's decision that certain sporadic cash payments did not qualify as a fringe benefit because they failed to meet consistency requirements. According to the administrative record, on July 13, 1995, August 3, 1995, and December 29, 1995, the petitioner made extra payments to its employees. There is a controversy as to the nature of these payments. The petitioner credited these payments towards its wage obligations and contends that

"there is no dispute that these payments were made to employees specifically to meet prevailing wage obligations." Pet'r's Obj. at 2. During his testimony before the ALJ, the petitioner's owner William Lang explained that during the summer of 1995, he realized that his employees were not receiving enough wages plus fringe benefits to satisfy the Davis-Bacon Act. Therefore, he paid the employees the lump sums: the amount of the deficiency per hour multiplied by the applicable number of hours as vacation pay, and the remainder as a bonus. He explained further:

> Because of this hourly fringe benefit requirement and the way that our fringe benefits are paid, which are not really by the hour, there is difficulty in knowing an established hourly rate. So we would be into the job for a while and see how these costs would be calculated on an hourly basis. And then when you would determine if there was a deficiency, then I thought that vacation pay would be a good way to rectify that so that we met the requirement for fringe benefits.

> [I chose vacation pay in particular b]ecause vacation pay is something that is paid out like several times a year and that would fit into what we had to do to comply with the fringe benefit requirement.

> I told . . . [the bookkeeper] to make some calculations based on representative weeks and come up with what a good representative number would be for the value of our fringe benefits and initially she gave me some figures. I determined that it was deficient. So then I decided to make payments that I knew would cover the deficiency.

A.R. at 686-87, Hr'g Tr., May 20, 1999.

In contrast to the petitioner's assertions, however, the Board found that "the record contains no evidence (other than uncorroborated testimony by Lang's owner) to support the contention that these disputed sporadic payments were made for vacation fringe benefits." *Id.* at 2007, Board Final Decision at Order. Although at the hearing he claimed he could not remember, at a deposition Mr. Lang admitted that he "probably told [his employees] that [the payment] was their bonus." *Id.* at 57, Hr'g. Tr., May 18, 1999.

Various employees testified at the hearing before the ALJ that Mr. Lang told them that the payments were for a bonus or just for doing a good job. *Id.* at 65, Hr'g Tr., May 18, 1999 (testimony of Frank Roza) (payments were "just for doing a good job. Keep up the good work."); *id.* at 96 (testimony of Gary Stanger) (payments were a "bonus," "basically, just for doing a good job"). Other employees said that Lang was silent as to the purpose of the money. *Id.* at 137 (testimony of Kurt Cameron) ("didn't hear what [the payment] was for" and doesn't have "any idea" what payment was for). One employee testified that the company told him that "it was something in the pay that the hours weren't right" and that it was somehow related to a Department of Labor investigation. *Id.* at 172 (testimony of Arthur Good). The check stubs given to the employees contain the notation "bonus" by the payment. A.R. at 119, Hr'g Tr., May 18, 1999 (testimony of Paul Warner); *id.* at 875 (check stub of Gary Stenger); *id.* at 890 (check stub of Paul Warner). The petitioner claimed approximately $11,000 in credit in this manner.

The ALJ found that the payments were not qualifying fringe benefits because Lang, Inc. did not follow the correct procedure in making the payments and they were too irregular to comport with the applicable regulations. The Board affirmed that part of the decision, and, as noted, the magistrate judge recommended affirmance. The petitioner objects on the ground that the regulation is inconsistent with the spirit and purpose of the Davis-Bacon Act itself and should be disregarded, citing *Thompson v. Diocese of Saginaw*, 2004 WL 45519 (E.D. Mich. 2004).

The Davis-Bacon Act permits employers to credit towards their wage obligations

the rate of contribution irrevocably made by a contractor or subcontractor to a trustee or to a third person pursuant to a fund, plan, or program; and

the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to laborers and mechanics pursuant to an

> enforceable commitment to carry out a financially responsible plan or program which
> was communicated in writing to the laborers and mechanics affected,
>
> . . . for vacation and holiday pay . . . or for other bona fide fringe benefits . . .

29 U.S.C. § 276a(a) (1994). Bonus payments are not a listed fringe benefit, and the government has

consistently denied to extend credit to such payments.

The regulations permit employers to make "an additional cash payment in lieu of the

required benefits," 29 C.F.R. § 5.31 (1995), but they impose timing requirements on cash payments

under the statute:

> All laborers and mechanics employed or working upon the site of the work . . . will
> be paid unconditionally and not less often than once a week, and without subsequent
> deduction or rebate on any account (except such payroll deductions as are permitted
> by regulations issued by the Secretary of Labor under the Copeland Act (29 CFR
> Part 3) ), the full amount of wages and bona fide fringe benefits (or cash equivalents
> thereof) due at time of payment computed at rates not less than those contained in the
> wage determination of the Secretary of Labor . . . regardless of any contractual
> relationship which may be alleged to exist between the contractor and such laborers
> and mechanics.
>
> Contributions made or costs reasonably anticipated for bona fide fringe benefits
> under section 1(b)(2) of the Davis-Bacon Act on behalf of laborers or mechanics are
> considered wages paid to such laborers or mechanics, subject to the provisions of
> paragraph (a)(1)(iv) of this section; also, *regular contributions made or costs
> incurred for more than a weekly period (but not less often than quarterly) under
> plans, funds, or programs which cover the particular weekly period, are deemed to
> be constructively made or incurred during such weekly period.* Such laborers and
> mechanics shall be paid the appropriate wage rate and fringe benefits on the wage
> determination for the classification of work actually performed, without regard to
> skill, except as provided in § 5.5(a)(4).

29 C.F.R. § 5.5(a)(1)(i) (1999) (emphasis added).

The handbook explains that "Reg 5.5(a)(1)(I) requires that contributions to fringe benefit

plans made by a contractor or subcontractor must be made on a regular basis, i.e., not less often than

quarterly." Handbook § 15f10.

The Board's conclusion is correct that the weight of the evidence proves that the payments were bonuses. William Lang's testimony that the payments were actually vacation payments is not corroborated by any other source. In contrast, several witnesses testified that they were told the payments were "bonuses" or for "doing a good job," and the check stubs verify this claim. The Board's decision on this ground certainly is supported by substantial evidence and is reasonable.

The petitioner's claim that the regulation is inapplicable or invalid fails as well. Its reliance on *Thompson v. Diocese of Saginaw* for a contrary proposition is misplaced. *Thompson* simply noted that the FMLA regulation relied upon in that case had been criticized by the Supreme Court as contravening the purposes of the statute. 2004 WL 45519 at 6-7 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 88-89 (2002)). In contrast, the Davis-Bacon Act actually requires payment "unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment." 40 U.S.C. s- 276a (1994). The agency's regulation promotes the statutory preference for the weekly payment of wages and fringe benefits. The regulation "accords with the text and structure of the" Davis-Bacon Act. *Ragsdale*, 535 U.S. at 88. The petitioner's objection on this ground lacks merit.

## D. Categorization of Workers

The magistrate judge concluded that the Board's decision on the categorization of Lang's employees should be overturned. The government objected to this conclusion.

The record developed at the administrative hearing contains evidence relating to the classification of equipment, which in turn determines the category of the worker who operates it. Each Lang, Inc. contract contains a section entitled "POWER EQUIPMENT OPERATOR CLASSIFICATIONS." Under Group 1, the following pieces of equipment are listed:

Backfiller tampler; Backhoe; Batch plant operator (concrete); Clamshell; Concrete paver (2 or more drums or larger); Conveyor loader (Euclid type); Crane (crawler, truck type or pile driving); Dozer; Dragline; Elevating grader; Endloader; Gradall (and similar type machine); Grader; Mechanic; Power shovel; Roller (asphalt); Scraper (self-propelled or tractor drawn); Side boom tractor (type D-4 or equivalent and larger); Slip form paver; Slope paver; Trencher (over 8 ft. digging capacity); Well drilling rig

A.R. at 1000.

Group 4 lists the following:

Boiler; concrete aw (40 hp or over); Curing machine (self-propelled); Farm tractor (with attachment); Finishing machine (concrete); Fire tender; Hydraulic pipe pushing machine; Mulching equipment; Oiler; Pumps (2 or more up to 4-in. discharge, if used 3 hours or more a day, or diesel powered - excluding submersible pumps); Roller (other than asphalt); Stump remover; Trencher (service); Vibrating compaction equipment, self-propelled (6 ft. wide or over)

*Ibid.*

Below these lists is the notation "ENGIO324F." *Ibid*. The Board took "judicial notice" that such a notation "means that the Administrator determined that the prevailing wage rates for heavy equipment operators were the International Union of Operating Engineers, Local 324's collectively-bargained wage rates." *Ibid.*

Several members of the industry testified regarding local industry practices regarding the classification of equipment. Ken Swartz, manager of a Michigan general contractor, testified that his company uses the "same equipment [with] different attachments" as Lang, and that the differences due to the attachments would not change the equipment's classification. *Id.* at 217. He admitted that his company does not actually use a stump grinder as such, but he said that the "level of controls" is the same between Lang's stump grinder and equipment that he used. *Ibid.* He testified that he expects a high level of skill and experience from an employee before he would permit that employee to operate such equipment.

-27-

John Hamilton is the president of union Operating Engineers, Local 324, which represents 12,000 Michigan construction workers. He testified that he is not sure how many land-clearing companies are covered by his union's contracts. He testified that when negotiating with employers, the union classifies equipment categories based on the machine's size and power, and the "expertise required to operate it." *Id.* at 227. Class IV workers have the "lowest skill," and operate smaller machines. *Id.* at 232. On cross-examination, he admitted that under the union agreements, several pieces of equipment designed to remove or grind stumps are classified as Class IV equipment. *Id.* at 260-61. He also admitted that the 1800-pound pump operator falls into Class I, even though it is vastly different in weight. *Id.* at 236. In contrast, a crusher, a winch truck, and a farm tractor can be much larger than a concrete pump, yet are classified into Class IV. *Id.* at 240, 248, 257.

Sam Hart, business manager of Local 324, testified that the union rate is "normally" the prevailing wage rate among contractors. *Id.* at 285, 288. Mr. Hart testified that based on the size of the equipment, the grapple skidders, stump grinders, and hydro-axes would normally be classified as Category I. *Id.* at 288-96. He based this conclusion on the size of the machine and the skill needed of the operator. *Id.* at 289-90. Mr. Hart testified that Lang Inc.'s stump remover is not what was contemplated by the union's designation of "mulching equipment" in Class IV because it is "actually . . . on an excavator." *Id.* at 298-300. In fact, "98 to 99 percent of people working on road jobs would be classified as Group I," because "really the only things they use out there anymore [in Group IV] is . . . a grease man with a grease truck or a mechanic helper." *Id.* at 320. He testified that he is not aware of any disagreement in the industry on how to classify the equipment, but admitted that his experience was only with unionized land clearing companies, which are only a portion of

all land clearing companies in the state. He did note, however, that the department of labor uses the union's collective bargaining agreements as the basis for the wage determinations.

Harry Fox, owner of a land clearing company, testified that classification depends on the skill of the operator, as well as the size and power of the equipment, but the "size and weight is the determining factor." *id.* at 392, Hr'g Tr., May 19, 1999. Mr. Fox testified that he classifies his equipment – including hydro-ax, skidder, tree chipper, stump grinder, and the bulldozer – in Class I, consistent with industry practice. All of his employees are paid at the Class I rate except for two individuals who are classified as apprentices and are outside of the classification structure. He stated that he has not had any employees grouped in Class IV in fifteen or twenty years. He thought if he were to buy a Lang, Inc. stump grinder, he would classify its operators as Class I. He further stated that Lang Inc.'s equipment would not count as "mulching equipment" under the contract given the size of the machines. *Id.* at 385-86. On cross-examination, he admitted that bulldozers are always in Class I regardless of size. He admitted that a crusher weighs twice as much as some small bulldozers, but is classified in Class II. Some farm tractors can be extremely large, the "same size, weight and power as the equipment that [Mr. Fox] use[s] in [his] operation," with a measure of skill to operate. *Id.* at 412.

David Park, the treasurer of B&V construction, which is an earth moving contractor that has subcontracted out land clearing work on federal projects, testified that he would put the stump grinder, hydro-ax and bulldozer into Class I due to the "size and the type of equipment is appears to have been modified from." *Id.* at 446-47. Out of the company's 250 employees, approximately 240 are classified in Class I, with "probably eight" as Class IV. *Id.* at 454.

Craig Sickmiller, Vice President of Finance of excavating contractor Sunset Excavating, testified that his company has hired land clearing subcontractors that usually use bulldozers, backhoes, skidders, and stump grinders. The classification categories depend on "the skill required to use [the equipment], and the nature of the equipment itself." *Id.* at 461. He noted that Class I equipment "are pieces of equipment that you operate from within the equipment itself," while Class IV "are pieces of equipment that are operated almost externally." *Ibid.* He testified that the Lang hydro-ax, grapple skidder, and tree chipper should all be classified as Class I. *Id.* at 463-68. The equipment could not be considered mulching equipment or a "stump remover" under Class IV, because these terms refer to landscaping type equipment that are "hand propelled." *Id.* at 467-69.

The ALJ opined that the labels assigned to the equipment in the contracts should take precedence and found in favor of Lang, Inc. on this issue. The Board reversed because the "ALJ's reasoning and rulings betray a basic misunderstanding of the legal principles governing employee classification disputes under the Act." *Id.* at 2021. The Board found that if union rates are used as the prevailing wage for a region, "proper classification of duties under the wage determination must be determined by the area practice of the unions that are party to the agreement." *Id.* at 2022 (internal citations and quotations and alterations omitted). According to the Board, because the Administrator used Local 324's collective bargaining agreements to determine the prevailing wage rates, the union's practice controls. The Board concluded that the ALJ had "no rational support" for rejecting the testimony of the union officials on the grounds that there were examples of Class IV equipment larger than Class I, because these "minor examples" were but a "tiny fraction of the total number of different pieces of heavy equipment listed among the four equipment operator subclassifications in the wage determinations." *Id.* at 2023-24. The Board was persuaded by Hart's

testimony that "Lang's four unlisted pieces of equipment were most similar to the generally larger equipment listed in Group I (such as the bulldozers Lang used)." *Id.* at 2025. "Conversely, Lang's four pieces of disputed heavy equipment were clearly dissimilar to the vast majority of the smaller, less powerful pieces of machinery listed in the wage determinations' Group IV classification." *Id.* at 2025-26. The Board found that the witnesses for the government had presented "copious, uniform, and unrebutted testimony" that Lang's equipment should be classified in Group I, and the ALJ erred by holding otherwise. *Id.* at 2027-28.

The magistrate judge disagreed and adopted reasoning similar to the ALJ's. The respondent levels two objections at the magistrate judge's conclusion: first, they state that the question of the agency's classification of workers is beyond the scope of judicial review; second, they contend that the magistrate judge's conclusion violates standard of review prescribed by the Administrative Procedure Act, 5 U.S.C. 706(2) because the magistrate judge improperly substituted his judgment for that of the Board.

The Administrative Procedures Act authorizes judicial review of all final agency actions except when "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Davis-Bacon Act requires that contractors pay their employees:

> the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State in which the work is to be performed.

40 U.S.C. § 276a (1994).

The regulations provide for the following procedure for determining how to classify workers:

(A) The contracting officer shall require that any class of laborers or mechanics, including helpers, which is not listed in the wage determination and which is to be employed under the contract shall be classified in conformance with the wage determination. The contracting officer shall approve an additional classification and wage rate and fringe benefits therefore only when the following criteria have been met:

(1) Except with respect to helpers as defined in 29 CFR 5.2(n)(4), the work to be performed by the classification requested is not performed by a classification in the wage determination; and

(2) The classification is utilized in the area by the construction industry; and

(3) The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination; and

(4) With respect to helpers as defined in 29 CFR 5.2(n)(4), such a classification prevails in the area in which the work is performed.

(B) If the contractor and the laborers and mechanics to be employed in the classification (if known), or their representatives, and the contracting officer agree on the classification and wage rate (including the amount designated for fringe benefits were appropriate), a report of the action taken shall be sent by the contracting officer to the Administrator of the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Washington, D.C. 20210. The Administrator, or an authorized representative, will approve, modify, or disapprove every additional classification action within 30 days of receipt and so advise the contracting officer or will notify the contracting officer within the 30-day period that additional time is necessary.

(C) In the event the contractor, the laborers or mechanics to be employed in the classification or their representatives, and the contracting officer do not agree on the proposed classification and wage rate (including the amount designated for fringe benefits, where appropriate), the contracting officer shall refer the questions, including the views of all interested parties and the recommendation of the contracting officer, to the Administrator for determination. The Administrator, or an authorized representative, will issue a determination within 30 days of receipt and so advise the contracting officer or will notify the contracting officer within the 30-day period that additional time is necessary.

(D) The wage rate (including fringe benefits where appropriate) determined pursuant to subparagraphs (1)(B) or (C) of this paragraph, shall be paid to all workers performing work in the classification under this contract from the first day on which work is performed in the classification.

29 C.F.R. § 5.5(a)(ii) (1995).

The Supreme Court held that under the Davis-Bacon Act, "Congress . . . direct[ed] the

Secretary of Labor to determine, on the basis of prevailing rates in the locality, the appropriate

minimum wages for each project. The correctness of the Secretary's determination is not open to attack on judicial review." *United States v. Binghamton Const. Co.*, 347 U.S. 171, 177 (1954). The Supreme Court has "expressed no view" on whether the "practices and procedures" of the wage determination may be reviewed under the APA. *Univ. Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 761 n. 10 (1981).

The Courts of Appeals have expressed differing views on the scope of review of Department of Labor worker classifications. Without discussing *Binghamton*, the Sixth Circuit reviewed and struck down the Department of Labor's regulation that applied Davis-Bacon requirements to truck drivers hauling asphalt to a work site. *L.P. Cavett Co. v. U.S. Dept. of Labor*, 101 F.3d 1111, 1113-14 (6th Cir. 1996); *see also North Georgia Bldg. & Constr. Trades Council v. Goldschmidt*, 621 F.2d 697, 707 (5th Cir. 1980) (court could review under the APA the Board's determination that the Davis-Bacon Act did not apply to project). The D.C. Circuit recently ruled that it could review the agency's determination of which classification the workers fell into for purposes of determining the appropriate prevailing wage. *Mistick PBT v. Chao*, 440 F.3d 503, 508 (D.C. Cir. 2006). The court held that it could review under the APA agency application of the regulations to the contractor's situation. *Id.* at 509. The court found that there was

> nothing in the Davis-Bacon Act, let alone clear and convincing evidence, demonstrating that Congress sought to preclude judicial review of the Secretary's compliance with the conformance regulations [at 29 C.F.R. § 5.5(a)(ii)(A)] or, looking even to the broader administrative activity at issue here, the Department's alleged failure to follow its own regulations in its post-bid dealings with a contractor.

*Ibid.* The court added that APA review was especially necessary for situations after the contractor has entered into a contract, because the contractor could not simply not bid on a project governed by an arbitrary and capricious wage determination. *Id.* at 510. In performing its review, the court

-33-

held that the agency did not act in an arbitrary or capricious manner by comparing the wage rates of unclassified workers.

The Court believes, consistent with *Mistick*, that it has the authority to review the manner in which certain workers have been slotted into classes established by the Department of Labor. This determination leaves untouched the Department's determination of the prevailing wage; it only examines wither certain workers fall into the categories determined by the agency.

Upon examining the Board's determination in this case under the deferential review standard established by the APA, the Court must conclude that the Board did not act in an arbitrary and capricious manner. The petitioner's challenge is leveled at both the procedural aspects of the Board's decision and the substantive outcome. *See BP Exploration & Oil, Inc.(93-3310) v. U.S. E.P.A.*, 66 F.3d 784, 792 (6th Cir. 1995) (observing that "a court's administrative review function as divisible into three categories: statutory, procedural, and substantive"). Procedurally, the petitioner believes that the Board erred by taking judicial notice of the meaning of the designation "ENGIO324" on the contract and lacked evidence for its decision. Substantively, the petitioner believes that the Board's decision is incorrect, contrary to the wage determinations.

Procedurally, the Board's decision-making process was not arbitrary. It considered all evidence and answered the objections raised by the petitioner. For example, although the petitioner is correct that many witnesses' testimony was challenged during cross-examination by pointing out pieces of equipment inconsistent with their theories, the Board explained why it still believed their testimony was persuasive. *See, e.g.,* A.R. at 2023-24. The witnesses were not rendered unreliable nor were they completely discredited; therefore the Board did not act arbitrarily by relying on their testimony. The Board also took judicial notice of the meaning of an abbreviation on a contract,

which is capable of accurate determination.  *See* Fed. R. Evid. 201 (judicial notice of adjudicative facts).

Substantively, the Board's decision that Group I workers operate larger machinery or have greater skill as a general rule than Group IV workers, and therefore are paid more, likewise is reasonable.  Moreover, the classifications are consistent with prevailing practices, based on the overwhelming evidence in the record.  There is no dispute that the several categories of the petitioner's equipment are large and require skilled operators.  The finding that the workers who operate them ought to classified in Group I is supported by substantial evidence, and it is not arbitrary, capricious, or contrary to law.

The Court, therefore, disagrees with the magistrate judge on this point and will sustain the respondents' objection.

### III.

The Court has considered the cross motions for summary judgment *de novo* in light of the magistrate judge's report and the parties' objections.  The Court finds that the petitioner's objections lack merit, the respondents' objections are well taken, the magistrate judge correctly determined that Board properly disallowed credit for fringe benefits in the three categories discussed above, and erred in suggesting that the Board incorrectly determined that certain workers were classified by the petitioner improperly in a lower prevailing wage category.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation [dkt #29] is **ADOPTED IN PART AND REJECTED IN PART**.

It is further **ORDERED** that the petitioner's objections to the magistrate judge's report [dkt #32] are **OVERRULED**.

It is further **ORDERED** that the respondents' objections to the magistrate judge's report [dkt #30] are **SUSTAINED**.

It is further **ORDERED** that the respondents' motion for summary judgment [dkt #18] is **GRANTED**.

It is further **ORDERED** that the petitioner's motion for summary judgment [dkt #19] is **DENIED**.

It is further **ORDERED** that the findings and decision of the United States Department of Labor's (DOL) Administrative Review Board are **AFFIRMED,** and the complaint is **DISMISSED** with prejudice.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  September 29, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2007.

s/Felicia M. Moses
FELICIA M. MOSES